JACK B. LINDEMAN AND KATHERINE G. LINDEMAN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6760–71.   Filed July 25, 1973.

*Richard W. Roe,* for the petitioners.
*Clarence F. Frazier, Jr.,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' income tax for 1968 and 1969 in the respective amounts of $854.19 and $915.17. The only issue is whether residential quarters furnished by petitioner Jack B. Lindeman's employer were "on the business premises of his employer" within the meaning of section

119 [1] so that the fair rental value of these quarters was excludable from his gross income for the years in controversy.

## FINDINGS OF FACT

Petitioners husband and wife filed their joint Federal income tax returns for 1968 and 1969 with the Southeast Service Center, Internal Revenue Service, Chamblee, Ga. At the time they filed their petition in this Court, they were legal residents of Fort Lauderdale, Fla. Jack B. Lindeman will hereinafter be referred to as petitioner.

Petitioner has been employed since 1959 as the general manager of Beach Club Hotel, the operating name of Beach Hotel Corp., Fort Lauderdale, Fla. In this capacity, he is responsible for the hotel's overall operations and for the selection and supervision of other management personnel. Petitioner has never had a written employment contract with his employer.

Beach Club Hotel is a three-story oceanfront hotel located at 3100 North Ocean Boulevard in Fort Lauderdale. The hotel building is a substantial structure situated on leased property more than 600 feet deep (east to west) and more than 200 feet wide (north to south). The building has a U-shape with the open end facing the Atlantic Ocean, the swimming pool and other recreational facilities being located within the U. The lot is bordered on the west (front) by North Ocean Boulevard (Highway A1A), a main thoroughfare; on the north by Galt Ocean Mile Hotel; on the east by the Atlantic Ocean; and on the south by Oakland Park Boulevard. The right-of-way width of Oakland Park Boulevard is 50 feet.

In addition to the hotel site proper, Beach Hotal Corp. for many years has leased lots 14 and 15 in the western half of block 10. They are located directly across Oakland Park Boulevard from the hotel on the southeast corner of the intersection of North Ocean Boulevard and Oakland Park Boulevard. These lots are paved and are used for parking by Beach Club Hotel's guests and employees.

Beach Hotel Corp. has leased lots 14 and 15 in block 10, as well as the hotel building, from 3200 Galt Ocean Drive Corp. (hereinafter Galt). These two corporations are controlled by C. H. Alberding of Chicago, Ill. Both corporations use the same mailing address in Fort Lauderdale.

From 1959 through 1963, petitioner and his family lived in a suite of four rooms in the Beach Club Hotel furnished without charge by his employer. In 1963, after a cost study, Beach Hotel Corp. concluded

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

that it would be more profitable to purchase or rent other accommodations for petitioner and his family so that the suite of four rooms they were occupying could be rented. Also, at that time the hotel needed additional parking facilities.

In 1963, Galt purchased three lots directly across Oakland Park Boulevard, to the south of the hotel building. This property is described as lots 16, 17, and 18 in block 11. A house is located on lot 18. In 1965, Galt purchased the north 25 feet of lot 15 in the same block. These four lots (15, 16, 17, and 18) are located at the intersection of Oakland Park Boulevard and N.E. Center Avenue, to the east of lots 14 and 15 in block 10. The parcels of land in block 11 were acquired as follows:

| Date | Property |
|---|---|
| 3/15/63 | Lot 18 |
| 4/3/63 | Lots 16 and 17 |
| 11/23/65 | North 25 feet of lot 15 |

Soon after the acquisitions were completed, Galt leased these properties to Beach Hotel Corp.,[2] anticipating that lots 16 and 17 (and, later, 15) would be used to meet the hotel's chronic need for additional parking and that the house on lot 18 would be used as petitioner's living quarters in lieu of the suite of rooms he was then occupying.

When Galt acquired lot 18, on which the house was located, the seller was permitted, by agreement, to continue to occupy the house until the end of 1963. Petitioner and his family moved into the house on lot 18 in January 1964.

After Galt acquired lots 16, 17, and 18 in block 11, Beach Club Hotel engaged a firm of architects to design plans for paving lots 16 and 17 for use as additional parking. During the period 1963 through 1965, at least three different plans were developed, calling for 53, 59, and 62 parking spaces, respectively, in anticipation of a change of the zoning of the lots from single-family residential use to permit their use for hotel parking. Beach Club Hotel filed a rezoning petition with the City of Fort Lauderdale (the City), but, due to objections voiced by nearby property owners, the petition for rezoning was withdrawn prior to any hearing on it. The parking plan for 53 cars was approved by the City "For Traffic Flow Only." No formal action seeking rezoning has taken place since Beach Club Hotel's petition was withdrawn, but the corporation plans to refile a rezoning petition when its officers believe approval can be obtained.

---

[2] The parties agree that the stipulation that Beach Hotel Corp. leases lot 18, block 11, from 3200 Galt Ocean Drive Corp. does not constitute a stipulation or inference that lot 18 is part of the business premises of Beach Hotel Corp. within the meaning of sec. 119(2).

In 1968, Beach Club Hotel added 56 rooms, and in order to obtain the building permit for those rooms Beach Hotel Corp. and Galt were required to enter into an agreement on parking facilities with the City. In this agreement, Galt, owner of lots 14 and 15 in block 10, agreed that those lots would continue to be used for the parking of automobiles for residents and guests of Beach Club Hotel and agreed not to sell the lots unless another approved parking area is substituted for them.

The lots in block 11 have not been rezoned, and this prevents Beach Hotel Corp. from paving them, erecting signs, or taking steps to prevent unauthorized persons from parking on the lots. However, guests, visitors, and employees of the hotel have used the lots for overflow parking since their acquisition by Galt.

As general manager of the hotel, petitioner is subject to call 24 hours a day, every day. His customary working hours are 8 a.m. to 5 p.m. However, he frequently returns to the hotel several times during an evening to handle management problems. The relocation of his living quarters from the hotel building to the house on lot 18 has not caused any change in his availability for services on short notice, and, in some respects, has improved his ability to observe hotel business operations.

Petitioner has a telephone in his home which connects directly through the hotel switchboard. Petitioner uses this telephone to conduct hotel business. Anyone calling him through the switchboard has no way of knowing whether he is in the hotel building or at home when he answers the call. Petitioner has an office in the hotel where he does most of his work; however, he also has an office in his home where he does some of his planning work, and he occasionally entertains hotel guests in his home.

### ULTIMATE FINDINGS OF FACT

Lot 18 in block 11, on which is located the residence in which petitioner lives, is within the perimeter of the business premises of Beach Club Hotel. Petitioner performs a significant portion of his duties as an employee of Beach Club Hotel in his residential quarters. The lodging furnished petitioner during 1968 and 1969 was "on the business premises of his employer" within the meaning of section 119.

### OPINION

As a general rule, all remuneration for services is gross income, and an employee's remuneration includes the value of lodging or living quarters furnished by his employer. See sec. 1.61–2(d), Income Tax

Regs. However, section 119 [3] excludes from an employee's gross income the value of lodging furnished to him by his employer if three conditions are met: (1) The lodging is furnished for the convenience of the employer; (2) the employee is required to accept the lodging as a condition of his employment; and (3) the lodging is "on the business premises" of the employer. Sec. 1.119–1(b), Income Tax Regs. The sole issue in the instant case is whether the house in which petitioner and his family lived during 1968 and 1969 was "on the business premises" of Beach Club Hotel.

These deceptively simple words—"on the business premises" of the employer—have been the subject of extended judicial opinions with varying results. See, e.g., *Commissioner* v. *Anderson*, 371 F.2d 59 (C.A. 6, 1966), reversing 42 T.C. 410 (1964), and *Gordon S. Dole*, 43 T.C. 697 (1965), affirmed per curiam 351 F.2d 308 (C.A. 1, 1965); see and compare *Wilson* v. *United States*, 412 F.2d 694, 696–697 (C.A. 1, 1969), with *United States* v. *Morelan*, 356 F.2d 199, 201, 204 (C.A. 8, 1966), and *United States* v. *Barrett*, 321 F.2d 911, 912 (C.A. 5, 1963).[4] We examine anew the legislative history of section 119 insofar as it bears on the issue presented for decision.

The requirement of section 119 that, to be excludable from gross income, lodging must be furnished and accepted "on the business premises" of the employer was first adopted as part of the 1954 Code. As passed by the House of Representatives, the section used the term "place of employment" rather than "business premises." H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 18, A39 (1954). The Senate changed the term to "business premises," but the accompanying report explained that "Under both bills meals and lodging are to be excluded from the employee's income if they are furnished at the place of employment and the employee is required to meet certain other conditions." S. Rept. No. 1622, to accompany H. R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 19, 190–191 (1954).

---

[3] SEC. 119. MEALS OR LODGING FURNISHED FOR THE CONVENIENCE OF THE EMPLOYER.

There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him by his employer for the convenience of the employer, but only if—

\*     \*     \*     \*     \*     \*     \*

(2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment.

[4] All of these cases are distinguishable from the instant one on their facts. *Commissioner* v. *Anderson*, 371 F.2d 59 (C.A. 6, 1966), reversing 42 T.C. 410 (1964), is discussed in the text which follows. In *Gordon S. Dole*, 43 T.C. 697 (1965), affirmed per curiam 351 F.2d 308 (C.A. 1, 1965), the lodging furnished the employee was located about 1 mile from the employee's place of work. The other three cases, *Wilson* v. *United States*, 412 F.2d 694 (C.A. 1, 1969), *United States* v. *Morelan*, 356 F.2d 199 (C.A. 8, 1966), and *United States* v. *Barrett*, 321 F.2d 911 (C.A. 5, 1963), involved State highway patrolmen who ate at restaurants on the highways of their respective States.

The Senate version was adopted with the following explanation in Conf. Rept. No. 2543, 83d Cong., 2d Sess., p. 27 (1954) :

The term "business premises of the employer" is intended, in general, to have the same effect as the term "place of employment" in the House bill. For example, lodging furnished in the home to a domestic servant would be considered lodging furnished on the business premises of the employer. Similarly, meals furnished to a cowhand while herding his employer's cattle on leased lands, or on national forest lands used under a permit, would also be regarded as furnished on the business premises of the employer. * * *

As in the case of other exclusions from gross income, this one is subject to abuse, and the statutory language must be construed with this thought in mind. Accordingly, the term "on" in relation to the employer's business premises does not mean "in the vicinity of" or "nearby" or "close to" or "contiguous to" or similar language, but is to be read literally. *Commissioner* v. *Anderson, supra* at 67. If the lodging is furnished at a location some distance from the place where the employee works, the lodging is not furnished on his employer's business premises.

In determining what are the employer's "business premises," Congress quite obviously intended a commonsense approach. Read literally, the statutory language ordinarily would not permit any exclusion for lodging furnished a domestic servant, since a servant's lodging is rarely furnished on "the business premises of his employer"; yet the committee report, quoted above, shows a clear intention to allow the exclusion where the servant's lodging is furnished in the employer's home. Similarly, the section, as a condition to the exclusion, does not require that the meals or lodging be furnished at any particular location on the employer's property; thus, the same committee report clearly states that meals provided for a cowhand are excludable even though they are furnished on leased lands or on lands used under a permit.

These illustrations in the committee report, moreover, demonstrate that section 119 does not embody a requirement that the meals or lodging be furnished in the principal structure on the employer's business premises. Thus, the committee report makes it explicitly clear that a cowhand's meals and lodging need not be furnished at the ranch headquarters. And surely the right of a domestic servant to the section 119 exclusion cannot be made to turn on whether his lodging is furnished in the family residence or in servants' quarters located elsewhere on the estate. Indeed, in *Boykin* v. *Commissioner*, 260 F.2d 249 (C.A. 8, 1958), affirming in part and reversing in part 29 T.C. 813 (1958), the Commissioner at least implicitly conceded that a physician's living quarters, located on the grounds of a Veterans Administration Hospital, were on his employer's business premises even

though he performed none of his employment services in his living quarters. Similarly, the Commissioner has ruled that meals furnished at branch offices of an employer, as well as at a central dining facility, meet the requirements of the section. Rev. Rul. 71–411, 1971–2 C.B. 103.

The issue as to the extent or the boundaries of the business premises in each case is a factual issue, and in resolving that question consideration must be given to the employee's duties as well as the nature of the employer's business. The section 119 exclusion applies where the lodging is furnished at a place where the employee performs a significant portion of his duties or on the premises where the employer conducts a significant portion of his business. *Commissioner* v. *Anderson*, 371 F.2d at 67. Or, in the words of this Court in *Gordon S. Dole*, 43 T.C. at 707, "the phrase should be construed to mean either (1) living quarters that constitute an integral part of the business property or (2) premises on which the company carries on some of its business activities."

We think petitioner has shown that the house which his employer furnished him during 1968 and 1969 was part and parcel of the "business premises" of Beach Club Hotel. In reaching this conclusion, we think it apparent that the business premises of the hotel are not limited to 3100 North Ocean Boulevard, where the hotel building is located, but include both parking lots and the house furnished to petitioner.

There is a large parking lot on the property where the hotel building is located, but it is by no means adequate to meet the needs of the hotel guests. The parking lot situated on lots 14 and 15 in block 10, across Oakland Park Boulevard at the intersection of North Ocean Boulevard, is used by hotel guests and employees and is essential to the operation of the hotel business. Even though these lots are across a street from the hotel building, they are obviously as much a part of the "business premises" of the hotel as the parking area located on the lot at 3100 North Ocean Boulevard.

Similarly, we think the block 11 lots—the north 25 feet of lot 15 and all of lots 16, 17, and 18 (on which the house in which petitioner resides is situated)—are also part of the business premises of the hotel. These lots were acquired by Galt and, in turn, leased to Beach Hotel Corp. solely in order to meet the business needs of the hotel. The evidence is undisputed that the block 11 lots were acquired by Galt and leased to Beach Hotel Corp. to alleviate a chronic shortage of parking spaces in connection with the operation of the hotel and to provide the hotel general manager with living quarters that were more economical to the hotel.

The evidence clearly shows that, during 1963 through 1965, a firm of architects developed various plans for paving lots 16 and 17 in block 11 for the parking of 53 to 62 cars. Although the petition for rezoning

the lots was withdrawn because of local opposition, the lots are nevertheless used for overflow parking. While the lack of zoning reduces the hotel's ability to deal effectively with trespassers, the record is clear that these lots are leased and used for the purposes of the hotel business. They are part of the premises of that business.

Moreover, the nature of the Beach Club Hotel business is such as to require the general manager to live where he is immediately accessible at all hours, and the house on lot 18 meets this need. It is stipulated that:

> In 1963, after a cost study, Beach Hotel Corporation determined it should be more profitable to purchase or rent accomodations [sic] for * * * [petitioner] and his family as close to the hotel as possible and have the suite of four rooms he was occupying available to be rented.

Thereupon, Galt acquired lot 18, containing the house, and Beach Hotel Corp. leased it to provide housing for petitioner and his family. This was a business decision based on business considerations, and there is no suggestion in the record that it was prompted by any other factors or that it involves an abuse of the section 119 exclusion.

The house is so situated and so used that it is part of the hotel plant. While petitioner's office is located in the business area of the hotel building (as it was while he occupied the suite of rooms as his residence), he is subject to call 24 hours a day, and he is as readily accessible for the frequent calls by direct telephone as he was in the suite located in the hotel building. He often returns to the hotel building several times in an evening. People dealing with him through the direct telephone line have no way of knowing whether he is in the hotel building or his home. Moreover, from the house he can observe the entire south half of the building and can "tell if there is a disturbance of any kind, see if lights are on or off, if the night lights don't come on early enough," and the like.

While petitioner does most of his management work in his office in the hotel building, he also has an office in the house on lot 18. In this latter office in his home, he receives calls from the hotel personnel or guests on the direct telephone line from the hotel while he is not on regular duty. He also uses this office when he is working on new brochures or rate structures and when he is planning a program for future hotel activities, such as "cook-outs, games, picnics on the beach, cocktail parties, and this sort of thing." In addition, he occasionally entertains a guest of the hotel.[5]

---

[5] Seeking a decision on the broader ground that the house was located "at the place of employment," petitioner deemphasizes the duties which he performs in this home office. However, under the meaning of the term "on the business premises," discussed above, we think his work at his home office as well as its proximity to the hotel building are factors to be taken into account.

In our view, these facts demonstrate that the lodging furnished petitioner is, within the meaning of section 119, "on the business premises of his employer" or, within the meaning of the accompanying committee reports, "at the place of employment." The house in which he lives is an indispensable and inseparable part of the hotel plant, and it is within the perimeter of the hotel property. Since it is part of the premises where petitioner performs the duties required in his job and where his employer carries on its business, we hold that petitioner is entitled to the section 119 exclusion.

*Commissioner* v. *Anderson*, 371 F.2d 59 (C.A. 6, 1966), on which respondent relies, is factually distinguishable. In that case, the housing furnished the employee was "two short blocks" from the facility being managed by the taxapayer (p. 61), and the Court of Appeals did not conclude, as we do here, that the living quarters of the employee-taxpayer were an integral part of the business property. Accordingly, the Court of Appeals held that the requirements of the statute were not met. In the instant case, the premises of the business managed by petitioner include the house in which his lodging was furnished.

Reviewed by the Court.

*Decision will be entered for the petitioners.*

---

TANNENWALD, *J.*, concurring: While the issue is not entirely free from doubt, I am satisfied that the majority has, on the facts of this case, reached a result which comports with the legislative intention as to what constitutes "*on* the business premises." (Emphasis supplied.) The operative framework of that clause is at best elusive and admittedly incapable of generating any hard and fast line. Nevertheless, it is possible to demarcate its outer boundaries and it is in this respect that I think that the majority opinion is deficient. Our decision in *Charles N. Anderson*, 42 T.C. 410 (1964), revd. 371 F.2d 59 (C.A. 6, 1966), has been sapped of its vitality to the point of extinction (cf. *Kenneth H. Hicks*, 47 T.C. 71, 74 (1966)) and I think we should say so explicitly. See concurring opinion of Raum, *J.*, in *Gordon S. Dole*, 43 T.C. 697, 707, 709 (1965), affirmed per curiam on the basis of that opinion 351 F.2d 308 (C.A. 1, 1965). We have an obligation, as Mr. Justice Cardozo once said, to "gather up the driftwood and leave the waters pure." See *Kenneth H. Hicks, supra.*

RAUM, *J.*, agrees with this concurring opinion.