HARALD T. GIESINGER AND INGRID GIESINGER, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8341-73.    Filed April 5, 1976.

*Benjamin M. Parker,* for the petitioners.
*John B. Pohl,* for the respondent.

WILBUR, *Judge:* Respondent has determined a deficiency in petitioners' Federal income tax for the taxable year 1970 in the amount of $1,191.92. The sole issue for decision is whether the fair rental value of lodging furnished to petitioner Harald T. Giesinger by his employer is excludable from gross income under section 119.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners Harald T. Giesinger and Ingrid Giesinger were residents of Bethesda, Md., at the time their petition was filed in this case. They filed their joint Federal income tax return for 1970 with the District Director in Baltimore, Md.[2]

Petitioner, during the year in issue, was chairman of the board and chief operating officer of Restaurant Corp. of America, Inc., (RCA). On April 18, 1966, RCA leased certain commercial space

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[2] Since Ingrid Giesinger is a party to this action solely by reason of filing a joint return with her husband, Harald T. Giesinger will be referred to as petitioner.

from Watergate Improvement Associates within the development known as Watergate.

The Watergate project is located in an area bounded by Virginia Avenue, New Hampshire Avenue, F Street, and the Potomac River Parkway, N.W., in the District of Columbia. Within this complex are located three apartment buildings, two office buildings, a hotel as well as shops and restaurants. Watergate was designed as a single project and was approved by the Board of Zoning Adjustments as a planned unit development. Each of the edifices within the Watergate project is physically connected on the lower three levels, B-1, B-2, and B-3, which are devoted to parking and shops. There are no public streets or roads within the Watergate project, but automobiles can drive between each of the buildings by virtue of the interconnecting underground levels.

Watergate was constructed in four phases, beginning in 1965. The primary structure constructed in phase one was the Watergate East Apartment Building. The following areas were leased by RCA in Watergate East:

(1) On level B-1, a portion of the Watergate Terrace where the main restaurant and related facilities were constructed. A substantial portion of the Watergate Terrace is adjacent to and underneath the Watergate Hotel which was constructed as a part of phase two.

(2) The pastry shop located on level B-2.

(3) On level B-2 the mall cafe and its small accompanying kitchen.

(4) On level B-2 the poolside snack bar (Wine Barrel) with a small kitchen, lounge, and dining room.

All of these areas were fully operational during the year in issue. In addition to the exclusive right to operate restaurants and cocktail lounges in the Watergate project, RCA was obligated to "provide catering services and room service for the entire Watergate project." The hotel guests and owners of all of the cooperative apartments within the Watergate project could sign checks as though the restaurant were an adjunct to the hotel and apartments. RCA engaged waiters assigned solely to room service, and printed menus for room service were placed in each hotel room. There were approximately 140 employees of RCA during the fiscal year ending August 28, 1970.

On May 25, 1967, about 2 months prior to the opening of the restaurant to the public on July 21, 1967, RCA's board of directors passed the following resolution:

> It was felt that after the Restaurant is in operation, at least one person representing the Board of Directors should live within the Watergate Complex, to insure a close contact with the operation, should an emergency situation arise.
>
> The Board of Directors therefore authorized the payment of the rent for one apartment in the Watergate Complex.

Pursuant to the resolution, RCA leased apartment 402S in Watergate East for a period beginning September 1, 1967, and provided such apartment as lodging to petitioner.[3] During the calendar year 1970, RCA paid $4,032 for the rental of apartment 402S. RCA retained this amount from the salary of petitioner since it considered the rental value of his Watergate apartment as part of his compensation. Apartment 402S is located five floors above the major retail facilities of petitioner's employer, and is almost directly above the pastry shop. The elevator near the fourth floor apartment exits within 30 or 40 feet of the pastry shop and the mall cafe.

As chief operating officer of RCA, petitioner had responsibility for the adaptation, planning, designing, and supervising of construction in the leased commercial space, and the equipping of the pastry shop, kitchen, lounge, cafe, and restaurant. Petitioner also engaged the needed personnel and had responsibility for the actual operations of RCA within the Watergate project.

The typical working day of petitioner during 1970 began at 7 a.m. and ended as late as 10 p.m. Petitioner's work was supervisory in nature and he attended to the operations of RCA within the complex whenever his services were needed. In addition to his daytime activities, petitioner was frequently called upon to deal with a variety of emergencies and problems arising late at night or early in the morning.[4] Petitioner's apartment within

---

[3] On Sept. 1, 1967, the date that RCA furnished apartment 402S in Watergate East to petitioner for his lodging, he was the owner of less than 5 percent of the issued stock of RCA, and 3 years later, in 1970, he was the owner of about 8 percent of its issued stock.

[4] Petitioner had to open the restaurant premises in the morning if the maitre d' did not arrive on time. On occasion he was awakened because of problems with the equipment or because a broken pipe had caused some flooding, and he was sometimes called when there was a particularly difficult problem concerning a customer. In addition, petitioner would sometimes check on the performance of the night cleaning personnel between the hours of 2 a.m. and 6 a.m. because these people were not otherwise supervised.

The restaurant and lounge operated 20 to 21 hours a day, 7 days a week, and services were offered to the public from 7 a.m. until 2 a.m. The pastry kitchen was in operation 24 hours a day, 7 days a week.

Watergate East enabled him to reach the scene of a problem very shortly after being awakened.[5] In fact, apartment 402S was almost directly above the pastry shop, and he could normally arrive there within 3 or 4 minutes.

It was the sole responsibility of petitioner at all hours of the day and night, to undertake the necessary corrective actions whenever difficulties arose involving hotel room service or catering within the Watergate project, because under the provisions of the leases the owners of the Watergate Hotel, the landlord of RCA, or the owners of the cooperatives within the Watergate project were without any authority or power even to attempt to resolve any breakdowns in the operations of RCA.

When the petitioner was out of the country on the business of RCA from December 31, 1969, to January 10, 1970, and from May 10, 1970, until July 9, 1970, he delegated some of his responsibilities to an employee of RCA who had worked with him for 15 years and who during the periods of petitioner's absence lodged in apartment 402S of Watergate East.

Petitioner's employment by RCA terminated when the owner of the Watergate Hotel acquired RCA on August 26, 1973. While the petitioner was subsequently engaged as a consultant by the acquiring company, he no longer had the duties and responsibilities of the chief operating officer of the food and beverage department of the hotel, which had been assumed by the management of the acquiring company, and petitioner vacated his Watergate East apartment.

OPINION

Gross income, as defined by section 61 of the Code, includes all income from whatever source derived, including compensation for services. The regulations provide that "If services are paid for other than in money, the fair market value of the property or services taken in payment must be included in income." Sec. 1.61-2(d)(1), Income Tax Regs. It is clear that, in the instant case, the lodging furnished to petitioner constituted compensation for services rendered by him, and that the fair market value of such lodging must be included in petitioner's gross income unless properly excluded under another provision of the Internal

---

[5] Mr. Guido Gerosa, manager of the Watergate Terrace and Mr. Albert Uster, petitioner's assistant and troubleshooter, normally worked an 8-hour day and neither individual resided in the District of Columbia during 1970.

Revenue Code. See *Commissioner v. Duberstein,* 363 U.S. 278 (1960); *Commissioner v. LoBue,* 351 U.S. 243 (1956).

Petitioner contends that the value of his lodging in Watergate East should be excluded under section 119. In order for petitioner to qualify for the section 119 exclusion, three conditions must be met:

(1) The lodging must be furnished on the business premises of the employer;

(2) The lodging must be furnished for the convenience of the employer; and

(3) The employee must be required to accept such lodging as a condition of his employment. Sec. 1.119-1(b), Income Tax Regs. The failure of petitioner to meet any one of these conditions will cause the value of his lodging to be included in gross income. *William I. Olkjer,* 32 T.C. 464 (1959); *Gordon S. Dole,* 43 T.C. 697 (1965), affd. per curiam 351 F.2d 308 (1st Cir. 1965). Respondent here contends that none of the three requirements for exclusion have been met.

Respondent first argues that petitioner's apartment in Watergate East was not on the business premises of his employer. We disagree.

We consider the instant case to be well within the ambit of our Court-reviewed decision in *Jack B. Lindeman,* 60 T.C. 609 (1973), acq. 1973-2 C.B. 2. In that case, the taxpayer was the general manager of an oceanfront hotel which was leased by his employer. In addition to the hotel site, taxpayer's employer leased certain lots across the street from the hotel which were used for employee and guest parking, and a house adjacent to these lots in which the taxpayer resided. While the taxpayer's customary working hours were 8 a.m. to 5 p.m., he was subject to call 24 hours a day, every day. Despite the fact that the lots and taxpayer's residence were across a 50-foot wide public street from the hotel itself, we held that the taxpayer's residence was "on the business" premises within the meaning of section 119.

We emphasized in *Lindeman* that in determining the boundaries of the business premises of the employer "consideration must be given to the employee's duties as well as the nature of the employer's business." In the instant case, RCA was exclusively responsible for providing food and beverage service throughout the entire Watergate project. In addition to the restaurant, cocktail lounge, pastry shop, and cafe operated by

RCA, the corporation was responsible for providing room service to apartment and hotel residents and canteen service in the Watergate office building.

Moreover, the Watergate is essentially a unified project. A car entering the garage can reach each building by any entrance. All of the major edifices in Watergate are interconnected. There are no public roads within its boundaries. Watergate was conceived, designed, and built as an interdependent unified whole. In directing RCA's operations and 140 employees, petitioner's responsibilities extended throughout the entire project and around the clock. Under these circumstances, it cannot be said that his living space was off the business premises.

In addition to the requirement that petitioner's employer provide catering and room services throughout various portions of the project, the apartment was physically located almost directly above the restaurant, pastry shop, and related facilities of petitioner's employer. Although it was separated by four floors from these facilities, the floors were connected with an elevator proximate to both the facilities, and both these facilities and the apartment were in the same building in a project physically integrated in a unique manner. Consequently, we find that petitioner's lodging was "on the business premises of the employer" within the meaning of section 119.

Respondent further contends that petitioner has failed to satisfy the remaining two requirements for exclusion under section 119; viz., that the lodging be provided for the convenience of the employer and that the employee be required to accept the lodging as a condition of his employment.

The condition-of-employment test is further elucidated by the regulations:

The requirement of subparagraph (3) of this paragraph that the employee is required to accept such lodging as a condition of his employment means that he be required to accept the lodging in order to enable him properly to perform the duties of his employment. Lodging will be regarded as furnished to enable the employee properly to perform the duties of his employment when, for example, the lodging is furnished because the employee is required to be available for duty at all times or because the employee could not perform the services required of him unless he is furnished such lodging. * * * [Sec. 1.119-1(b), Income Tax Regs.]

See also *Mary B. Heyward,* 36 T.C. 739 (1961), affd. per curiam 301 F.2d 307 (4th Cir. 1962), and S. Rept. No. 1622, to

accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 190 (1954).

The "condition of employment" and "convenience of the employer" tests are basically similar. *United States Junior Chamber of Commerce v. United States,* 334 F.2d 660 (Ct. Cl. 1964), and the factual considerations substantially the same. Under the factual setting here, it is clear that petitioner's Watergate East apartment was necessary for him to properly perform the duties of his employment.

At the outset, we note that RCA's board of directors specifically directed that one person live in Watergate to insure close contact with the operation. As RCA's chief operating officer, petitioner had been responsible for setting up the food and beverage facilities and was the person most familiar with RCA's Watergate operations. While living in Watergate, petitioner was on call 24 hours a day. During this period a number of problems and emergencies did arise which required his immediate attention. Petitioner's fourth floor apartment enabled him to reach the scene of a problem quickly. Moreover, petitioner's proximity to the operations allowed him to frequently check on otherwise unsupervised night personnel. When petitioner was out of the country on business, he delegated his responsibilities to an assistant who stayed in petitioner's apartment during those periods. On the basis of the whole record we conclude that petitioner's lodging was for the convenience of the employer and that he was required to accept the lodging as a condition of his employment. Consequently,

*Decision will be entered for the petitioner.*