JAMES H. MCDONALD AND AMELIA H. MCDONALD, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6280-74.    Filed May 5, 1976.

*Charles Boyce* and *Tom Rowentree III,* for the petitioners.
*Stephen R. Takeuchi,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1970 and 1971 in the amounts of $3,419.65 and $3,931.82, respectively. The sole issue presented requires our determination as to whether the payment by petitioner James H. McDonald's employer of the costs of petitioners' living accommodations in Tokyo, Japan, constitutes income includable in petitioners' gross income for 1970 and 1971, and if so, to what extent.

FINDINGS OF FACT

Certain facts have been stipulated by the parties and are accordingly so found.

Petitioners James H. and Amelia H. McDonald are husband and wife who, at the time of the filing of the petition herein, resided in Pittsburgh, Pa. Petitioners filed joint U.S. individual income tax returns for each of the years 1970 and 1971 with the Office of International Operations, Internal Revenue Service Representative, Tokyo, Japan.

Petitioner James H. McDonald (hereinafter referred to as petitioner) is a United States citizen and has been employed by Gulf Oil Corp. or one of its subsidiary companies since 1952. Until 1969, petitioner was assigned to different locations throughout the United States, mainly in the States of Texas, Florida, and Pennsylvania.

Effective September 1, 1969, petitioner was transferred from his employment location in Coral Gables, Fla.,[1] to Tokyo, Japan, and was assigned to Gulf Oil Co.-Asia, a Delaware corporation, and Pacific Gulf Oil, Ltd., a corporation organized under the laws of Japan. Both Gulf Oil Co.-Asia and Pacific Gulf Oil, Ltd., are wholly owned subsidiaries of Gulf Oil Corp. Gulf Oil Co.-Asia is the subsidiary responsible for all operations in the Asian area, including, inter alia, the countries of Japan, Korea, Republic of China, Philippines, Thailand, and other locations such as Hong Kong and Singapore. Pacific Gulf Oil, Ltd., is a service company located in Tokyo which carries out the day-to-day physical operations, principally in Japan.

Upon his transfer to Tokyo, petitioner was appointed vice president of Gulf Oil Co.-Asia and manager—Refining of Pacific Gulf Oil, Ltd. His basic salary of $28,000 was continued by Gulf Oil Corp., and petitioner continued to participate in the profit plans of Gulf Oil Corp. and its participating subsidiaries. In addition, petitioner received several supplements to his basic salary in the form of cost of living, overseas differential, education, home leave, and quarters allowances. Subsequently, on November 15, 1971, petitioner was appointed executive vice president of Gulf Oil Co.-Asia and general manager of Pacific Gulf

---

[1] On Sept. 1, 1969, petitioner, his wife, and three children resided in Coral Gables, Fla. Petitioners sold their residence in Coral Gables approximately the time petitioner and his family moved to Tokyo. In 1970 and 1971, petitioner and his family had no residences other than those in Tokyo described *infra*.

Oil, Ltd. His salary was increased from time to time in accord with Gulf Oil Corp.'s salary policies.

Pacific Gulf Oil, Ltd. (hereinafter sometimes referred to as Gulf), had a long-standing policy of providing living accommodations for its employees who were not Japanese citizens (expatriate employees).[2] Gulf's practice was to lease a sufficient number of apartments and/or houses in the central Tokyo area and continuously maintain such premises for assignment to the expatriate employees. The policy was intended to facilitate an employee's relocation and adjustment to a new cultural and employment environment and thereby mitigate any potential detractions from the employee's efficiency and performance on the job. Gulf required the housing accommodations to be of the "western-type,"[3] safe, in close proximity to the business office of Gulf, and equipped with telephone communication for overseas calls. Generally, such western-style housing costs more than Japanese-style housing, the lessors require a 6- or 12-month advance rental payment plus a similar amount as a deposit in case of damage, and they prefer to enter into lease arrangements with a corporate employer rather than the employee.

In accordance with this housing policy, during the period from approximately January 7, 1970, to approximately July 1970, petitioner resided in the Rappongi area of Tokyo with his family in premises available to him pursuant to an agreement of lease executed between the lessor/owner and Gulf. The monthly lease payment was payable in Japanese yen by Gulf. During the period July 1970 through December 31, 1971, petitioner and his family resided in Tokyo in an apartment at the Azabu Towers Apartments. This apartment was also made available to him under an agreement of lease entered into between the lessor/owner and Gulf. In both instances, the lessors of the respective premises were not and are not related to Gulf Oil Corp. or its subsidiaries, or petitioner. During 1970 and 1971, the lessors were in the trade or business of leasing such housing and the aforementioned agreements of lease were the results of arm's-length transactions.

---

[2] No housing accommodations were provided by Gulf for its employees who were Japanese citizens.

[3] "Western-type" in this context refers to housing with central heating and cooling, separate kitchen, bedroom and living areas, carpeted floors, and certain additional appliances. This contrasted with "Japanese-style housing" which were usually smaller units with fewer separate rooms, having paper walls, and kitchen and bathroom facilities not as modern as the "western-type housing."

Both the Azabu Towers Apartments and petitioners' first residence (in the Rappongi area) were located approximately 1½ miles from the offices of Gulf. For the most part, petitioner took a taxi to and from the office.

Petitioner's apartment in Azabu Towers was one of the six or seven units in the building which Gulf rented for its employees. The apartment consisted essentially of five rooms: A living room/dining room combination, a kitchen, one large bedroom, and two small bedrooms, totaling 1,500 square feet of living space. The house in Coral Gables, Fla., which petitioner sold incident to his transfer to Tokyo had four bedrooms, a living room, dining room, family room, and Florida room, with a total of approximately 3,000 square feet of living area.

Occasionally petitioners used their Azabu Towers apartment to entertain business guests. A few times a week petitioner used the telephone in his residence to place or receive business-related telephone calls which he chose not to do at the office during his regular business hours because of the time difference between Tokyo and the United States.

Petitioner's employer did not require, as a condition of employment, that petitioner reside in housing designated or assigned by Gulf Oil Corp. or its subsidiaries, nor did Pacific Gulf Oil, Ltd., restrict petitioner's use of the premises occupied by him and his family.

The amounts of rent and utilities paid by Gulf for the premises occupied by petitioner and his family as a residence in 1970 and 1971 were as follows (amounts are in U.S. dollars):

|  | 1970 | 1971 |
|---|---|---|
| Rent | $11,121 | $11,508 |
| Utilities | 1,515 | 1,656 |
| Total | 12,636 | 13,164 |

Petitioner was charged by his employer $150 per month for the use of the above-specified living quarters.

On their joint U.S. income tax return for each of the years 1970 and 1971, petitioners included an additional amount of $200 per month as additional income attributable to their use of the living quarters for the respective years. Specifically, in computing their total earned income from sources outside the United States as required by Form 2555 (Exemption of Income Earned Abroad), petitioners reported thereon in 1970 and 1971

allowances for quarters in the amounts of $2,334.25 and $2,400, respectively. In addition, petitioners reported in each year allowances for cost of living, overseas differential, education, and home leave.

In the statutory notice issued to petitioners, respondent determined adjustments in petitioners' gross income for "Understated Fair Market Housing Allowance" in the amounts of $8,501.75 for 1970 and $8,964 for 1971, computed as follows:

|  | 1970 | 1971 |
|---|---|---|
| Cost of housing | $12,636.00 | $13,164 |
| Less: Petitioners' payments | (1,800.00) | (1,800) |
| Amount includable | 10,836.00 | 11,364 |
| Amount included in return | 2,334.25 | 2,400 |
| Increase in income | 8,501.75 | 8,964 |

In their petition, petitioners not only allege as error the above increases in their income but also claim an overpayment of tax resulting from the erroneous inclusion in their income for the years 1970 and 1971 of the amounts paid to petitioner's employer as rent and the amounts petitioners arbitrarily included in their returns as the value of the housing furnished to them by petitioner's employer.

### OPINION

At issue herein is whether petitioners realized income includable in gross income for 1970 and 1971 by virtue of the payment by Pacific Gulf Oil, Ltd., petitioner James H. McDonald's employer, of the costs of petitioners' accommodations in Tokyo, Japan, and if so, whether such actual costs represent the appropriate measure of the value thereof to be included in gross income.

Gross income means all income from whatever source derived, including compensation for services. Sec. 61(a), I.R.C. 1954.[4] It includes income realized in any form, i.e., money, property, or services. If compensation for services is paid in the form of property, the fair market value of the property must be included in income. Sec. 1.61-2(d), Income Tax Regs. It is clear that the lodgings furnished to petitioners by Gulf were furnished because of petitioner's employment relationship with Gulf. Consequently,

---

[4] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise specified.

the value of those lodgings is includable in petitioners' gross income unless specifically excludable under another provision of the Code. *Commissioner v. Duberstein,* 363 U.S. 278 (1960); *Commissioner v. LoBue,* 351 U.S. 243 (1956); *Gordon S. Dole,* 43 T.C. 697 (1965), affd. per curiam 351 F.2d 308 (1st Cir. 1965).

Petitioners rely primarily on section 119 by application of which provision petitioners contend that the value of the lodging provided is excludable from gross income. Consistent with this theory, petitioners further assert that section 119 entitles them to a refund for 1970 and 1971 in respect of the estimated additional rental value which they reported in each of those years as "Allowances for quarters." If, however, section 119 does not apply to exclude from gross income the value of their living accommodations, petitioners contend in the alternative that they fully reported in 1970 and 1971 all income attributable to their use of the lodging provided by Pacific Gulf. Petitioners reason as follows: The amount of income properly includable in gross income is the value of the living accommodations; that value is not the actual cost thereof to Gulf, but rather the rental value to petitioners, estimated by them to be $350 per month, which estimated value is reflected in the aforementioned allowances reported on petitioners' returns for 1970 and 1971; therefore, petitioners conclude that no understatement of income exists upon which to predicate the deficiency in issue.

Respondent contends that petitioners fail to qualify for the exclusion provided by section 119 and that the value of the accommodations provided by Gulf constitutes gross income to the extent that the costs incurred by Gulf exceed the amount of rent paid by petitioners.

We agree with respondent. While we believe that there is ample authority on the basis of which we might more summarily decide the instant case,[5] we believe that petitioners' efforts in the presentation of their case warrant a response in kind; accordingly, we proceed to a consideration of petitioners' argument in respect of the applicability of section 119.

Section 119 provides as follows:

---

[5] Specifically, we note that the instant case is on all fours with our recent opinion in *Philip H. Stephens,* T.C. Memo. 1976-13, wherein we held that the taxpayers received gross income to the extent that Philip H. Stephens' employer paid the cost of their living accommodations while located in Tokyo, Japan.

### SEC. 119. MEALS OR LODGING FURNISHED FOR THE CONVENIENCE OF THE EMPLOYER.

There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him by his employer for the convenience of the employer, but only if—

(1) in the case of meals, the meals are furnished on the business premises of the employer, or

(2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment.

In determining whether meals or lodging are furnished for the convenience of the employer, the provisions of an employment contract or of a State statute fixing terms of employment shall not be determinative of whether the meals or lodging are intended as compensation.

In order to avail themselves of the exclusion provided thereby, petitioners must satisfy all three of the criteria set forth in section 119; i.e., the lodgings must be furnished for the convenience of the employer, on the business premises of the employer, and the employee is required to accept the lodgings as a condition of his employment. Sec. 1.119-1(b), Income Tax Regs. Failure to establish any one of these criteria suffices to preclude application of section 119. *Gordon S. Dole, supra.*

In attempting to establish that both the Rappongi residence and the Azabu Towers apartment were furnished for the convenience of Gulf, petitioners point to Gulf's long-standing policy of providing living accommodations for its expatriate employees and the underlying business interests served thereby. Further, petitioners argue that, as a practical matter, without the benefit of the housing policy suitable accommodations were unavailable to expatriate employees so that the housing policy was in fact necessary to enable Gulf to conduct its operations in Tokyo; thus, a fortiori, the lodgings furnished to petitioners satisfy the convenience criterion.

While its practice of maintaining various leasehold interests for assignment to expatriate employees may have accorded Gulf a benefit in terms of flexibility in personnel transfers, that is not to conclude that the assignments of these lodgings to petitioners at a discount similarly served the interests of Gulf; that is, although convenience may have dictated the form in which the leasehold arrangements were structured, the convenience of Gulf did not require it to subsidize the assignments. While Gulf may have realized some indirect benefit from the arrangements, they were

made primarily to meet the needs and for the convenience of its expatriate employees.

Nor do we agree with petitioners' contention that the Tokyo housing situation was so devoid of alternatives as to be analogous to the circumstances of *William I. Olkjer,* 32 T.C. 464 (1959), upon which petitioners rely. There, in holding that the meals and lodging provided by the taxpayer's employer at a construction site in Greenland were furnished for the convenience of the employer so as to warrant application of section 119, we noted that:

In the first place, there were no facilities available at the jobsite for meals and lodging other than those furnished by the employer. * * * Thus, the facilities so furnished were not only for the employer's convenience, but were indispensable if any work was to be accomplished. * * * [32 T.C. at 468.]

The instant case presents no such clear indicia of employer convenience. Moreover, the fact that the Gulf housing policy applied only to expatriate employees supports our conclusion that living accommodations were provided primarily as a function of the personal preferences of certain employees, not the convenience of Gulf.

Thus, while its housing policy may have indirectly benefited Gulf to the extent that it facilitated an employee's transfer to Tokyo and thereby enhanced job performance, we believe that the convenience of the employer test contemplates a more direct nexus between the lodging furnished and the asserted business interests of the employer served thereby. See *William I. Olkjer, supra.*

Notwithstanding the fact that failure to establish the requisite convenience of the employer of itself precludes application of section 119, *Gordon S. Dole, supra,* we turn to a consideration of whether petitioners' accommodations were "on the business premises" of Gulf, the second condition required by section 119. As both petitioners and respondent recognize, the business premises are not defined solely in terms of the employee's place of employment, cf. sec. 1.119-1(c)(1), Income Tax Regs.,[6] but may include housing where the employee performs a significant portion of his duties or where the employer conducts a significant portion of its business. *Jack B. Lindeman,* 60 T.C. 609 (1973);

---

[6] Sec. 1.119-1(c)(1) provides, in pertinent part:

(c) *Rules.* (1) For purposes of this section, the term "business premises of the employer" generally means the place of employment of the employee. * * *

*Commissioner v. Anderson,* 371 F.2d 59 (6th Cir. 1966), revg. 42 T.C. 410 (1964), cert. denied 387 U.S. 906 (1967). We believe petitioners fail to satisfy either construction of "on the business premises." As indicated in our findings, *supra,* the only business activities conducted by petitioner James H. McDonald in his residence were the occasional entertainment of business guests and the periodic use of the telephone to place or receive business calls not conveniently handled during regular business hours in Tokyo. While incident to both the performance of petitioner's particular responsibilities and the general conduct of the business of Pacific Gulf Oil, Ltd., the entertainment and telephone activities do not constitute the requisite quantum or quality of activities to qualify as the "significant portion" prescribed by both alternative constructions of "on the business premises."

Lastly, the third criterion for application of section 119 requires that the lodging be provided as a condition of employment, which test section 1.119-1(b), Income Tax Regs., defines as follows:

(b) *Lodging.* * * *
* * *

The requirement of subparagraph (3) of this paragraph that the employee is required to accept such lodging as a condition of his employment means that he be required to accept the lodging in order to enable him properly to perform the duties of his employment. Lodging will be regarded as furnished to enable the employee properly to perform the duties of his employment when, for example, the lodging is furnished because the employee is required to be available for duty at all times or because the employee could not perform the services required of him unless he is furnished such lodging. * * * [Sec. 1.119-1(b), Income Tax Regs.]

Thus, the fact that petitioner James H. McDonald was not expressly required to accept the accommodations as a condition of his employment in Tokyo is not determinative; instead, we focus on whether, as a practical matter "the employee's occupancy of the lodging furnished by his employer is necessary in order for the employee to perform properly the duties he is employed to perform." *Mary B. Heyward,* 36 T.C. 739, 744 (1961), affd. per curiam 301 F. 2d 307 (4th Cir. 1962). See *Coyner v. Bingler,* 344 F. 2d 736, 738 (3d Cir. 1965).

In essence, petitioners predicate qualification under this definition of the condition of employment test upon their contention that it was necessary that James H. McDonald reside in western-style housing. Petitioners reason as follows: Only

western-style housing provided the entertainment and telephone facilities, as well as the safety, living convenience, and space, without which petitioner could not execute his employment duties; the Rappongi residence and the Azabu Towers apartment were, in accordance with the standards of the Gulf housing policy, western-style accommodations; thus, the proper performance of petitioner's employment responsibilities mandated his acceptance of the accommodations provided by Gulf.

We believe, however, that the condition of employment test requires that the lodging be more integrally related to the various facets of an employee's position; here, we doubt that the proper performance of petitioner's executive and management responsibilities depended on the incidental availability of entertainment and telephone facilities purportedly peculiar to western-style housing. As distinguished from the situation in *United States Junior Chamber of Commerce v. United States,* 334 F. 2d 660 (Ct. Cl. 1964), upon which petitioners rely, where the lodging (the U.S. Jaycee White House) furnished by the United States Junior Chamber of Commerce to its president as his official residence during his 1-year term, as well as his office and place to conduct staff meetings, business entertainment, and other aspects of the Chamber's business, was held to be excludable from the president's gross income, the accommodations provided to petitioners were not so directly related to or specially identified with the business of Gulf, an integrated petroleum company. Nor is the instant case one in which the lodging provided enabled the employee to be available for duty at all times. See sec. 1.119-1(b), Income Tax Regs., and compare *Harald T. Geisinger,* 66 T.C. 6 (1976). Instead, we invoke our analysis in *Mary B. Heyward, supra,* wherein we stated:

if the duties the employee is employed to perform do not require his occupancy of the lodging furnished by the employer, but the employer appears to have lodging available and it seems more desirable that the employee occupy the premises, we do not think the value of the lodging is excludible from gross income under section 119. [36 T.C. at 744.]

and conclude therefrom that petitioners' accommodations similarly fail to qualify for exclusion from gross income under section 119.

Having determined that each of the three tests imposed by section 119 suffices to preclude application thereof[7] so that pursuant to section 61 and the regulations thereunder,[8] the value of petitioners' living accommodations is includable in gross income for 1970 and 1971, we must decide whether the actual costs incurred by Gulf represent the appropriate measure of the value to be included in gross income, as respondent contends, or whether the value of the accommodations does not exceed $350 per month, as estimated by petitioners.

Respondent's determination of the value of the lodgings is presumed to be correct and the burden of proof is on petitioners to prove it is wrong. *Mary B. Heyward, supra;* Rule 142, Tax Court Rules of Practice and Procedure. Petitioner's burden is heavy here where respondent's determination is based on the rent required to be paid for petitioners' lodgings by Gulf under a lease agreement negotiated at arm's length between Gulf and the owner-lessors of the lodgings.

Petitioners contend, however, that the cost to Gulf is not determinative of the value of the lodgings to them because the lodgings were furnished pursuant to the housing policy of Gulf and for its primary benefit, and that any benefits resulting to petitioners were incidental and subordinate to those accruing to Gulf. Petitioners assert that rather than receiving a benefit they,

---

[7] Our conclusion as to the inapplicability of section 119 is also dispositive of petitioners' claim for a refund for each of the years in issue.

[8] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

(1) Compensation for services * * *

Sec. 1.61-2. Compensation for services, including fees, commissions, and similar items.

(d) *Compensation paid other than in cash*—(1) *In general.* If services are paid for other than in money, the fair market value of the property or services taken in payment must be included in income. If the services were rendered at a stipulated price, such price will be presumed to be the fair market value of the compensation received in the absence of evidence to the contrary. * * *
* * *

(3) *Meals and living quarters.* The value of living quarters or meals which an employee receives in addition to his salary constitutes gross income unless they are furnished for the convenience of the employer and meet the conditions specified in section 119 and the regulations thereunder. * * *

Sec. 1.119-1. Meals and lodging furnished for the convenience of the employer.

(b) *Lodging.* * * * If the tests described in subparagraphs (1), (2), and (3) of this paragraph are not met, the employee shall include in gross income the value of the lodging regardless of whether it exceeds or is less than the amount charged. In the absence of evidence to the contrary, the value of the lodging may be deemed to be equal to the amount charged.

in fact, suffered a loss in terms of housing standards when compared to the accommodations they occupied in Coral Gables. They base their estimate of the value of their lodgings primarily on what a study indicated an average American businessman with a position and salary comparable to petitioner's would spend for lodgings in the United States.

While we recognize the general validity of petitioners' premise that an item may have different values to different persons, see *Lawrence W. McCoy,* 38 T.C. 841 (1962), we find petitioners' argument to be without merit here. Unlike in *McCoy,* where we held that the fair market value to the taxpayer of an automobile received as a prize in his employer's sales contest was less than the cost to the employer we are considering here the value of lodgings which were a necessity to petitioners when living in Tokyo. There is no evidence that the lodgings occupied by petitioners could have been rented for any amount less than paid by Gulf; and the fact that a businessman would pay $350 for lodgings in the United States has nothing to do with what such businessman would pay for lodgings in Tokyo.[9] We have no evidence that any lodgings acceptable to petitioners could have been obtained in Tokyo for less than the rent paid by Gulf. Petitioners chose to accept the lodgings furnished by Gulf and the best evidence of the value of those lodgings is the rent paid by Gulf.

By emphasizing the purported benefits to Gulf, petitioners attempt to analogize the instant case to the situation in *United States v. Gotcher,* 401 F. 2d 118 (5th Cir. 1968), affg. in part and revg. in part 259 F. Supp. 340 (E.D. Tex. 1966), where the court held that the costs of the taxpayers' 12-day expense-paid trip to tour the Volkswagen facilities in Germany, to the extent attributable to Gotcher, who was an employee of an American Volkswagen dealership and a prospective part-owner thereof, did not constitute gross income to the taxpayers since "the personal benefit to Mr. Gotcher from the trip was merely incidental to VW's sales campaign." (401 F.2d at 124.) Suffice it to say that the single-instance, sales-promotion trip accepted by the taxpayers in *United States v. Gotcher, supra,* is manifestly

---

[9] In recognition of the variance in cost of living in the United States and Tokyo, Gulf paid its employees assigned to Tokyo cost of living, overseas differential, education, home leave, and quarters allowances.

distinguishable from petitioners' continuing occupancy of residential accommodations while in Tokyo.

Indeed, in discussing the tests for inclusion under section 61, the court in *United States v. Gotcher* stated at page 121: "The concept of economic gain to the taxpayer is the key to section 61. * * * This concept contains two distinct requirements: There must be an economic gain, and this gain must primarily benefit the taxpayer personally." Clearly petitioners realized an economic gain to the extent that Gulf provided them with lodging, the cost of which they would otherwise have incurred in order to live in Tokyo. Not only were the leases negotiated in arm's-length transactions such that the rental paid by Gulf fairly reflects the fair market value thereof but also, as indicated in our discussion *supra* as to the application of section 119, the accommodations were provided primarily for petitioners' benefit and convenience.

On the basis of the foregoing, we conclude that the value of the lodgings provided by Gulf to petitioners, as measured by the costs incurred by Gulf in respect thereof ($12,636 in 1970 and $13,164 in 1971), is includable in petitioners' gross income for 1970 and 1971. Accordingly, petitioners are required to include as income the additional amounts of $8,501.75 for 1970 and $8,964 for 1971, which figures represent the costs paid by Gulf in each year, reduced by the sum of the rent paid by petitioners ($1,800 in each year) and the rental value reported on petitioners' returns ($2,334.25 and $2,400, respectively).

*Decision will be entered for the respondent.*