BOBBY G. HUNTER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hunter v. Commissioner
Docket No. 8980-92
United States Tax Court
T.C. Memo 1994-524; 1994 Tax Ct. Memo LEXIS 532; 68 T.C.M. (CCH) 979; October 18, 1994, Filed *532 Decision will be entered under Rule 155. Bobby G. Hunter, pro se. For respondent: Donna Bice Read. POWELL
POWELL
MEMORANDUM OPINION POWELL, Special Trial Judge: This case was heard pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
By notice of deficiency issued on January 29, 1992, respondent determined a deficiency in petitioner's 1989 Federal income tax in the amount of $ 1,164 and an addition to tax under section 6651(a) in the amount of $ 291 for not filing a tax return for 1989. Petitioner resided in Mangum, Oklahoma, at the time he filed his timely petition, but he subsequently moved to Amarillo, Texas. The issues are whether the Form 1099-MISC issued by Consumer Media Technology, Inc. (CMT) for 1989 reflected self-employment income to petitioner and whether petitioner is subject to the *533 addition to tax for failure to file. The facts may be summarized as follows. CMT is an advertising company that specializes in localized print advertising. CMT works with supermarkets, selling ad space on grocery bags to businesses in the vicinity of the supermarket. CMT maintains a nationwide network of salespeople to solicit potential advertisers. Salespeople earn a commission on each sale, and supervisors make an "override" commission on the sales of those they supervise. CMT performs a thorough background check on applicants for sales positions, and successful applicants are asked to sign an "Independent Contractor Agreement" (the contract). The operative provisions of the contract indicate that the salesperson agrees: A. To sell advertising for placement on advertising products and services provided by CMT for [sic] the behalf of CMT. B. To pay for all his own travel, entertainment, and work related expenses. C. To immediately remit to CMT any monies or other consideration collected from his customers or others for the account of CMT. D. All sales promotional material, salesman's supplies, customer list, order forms, records, trade secrets, and information *534 entrusted to INDEPENDENT CONTRACTOR by CMT, shall be, and remain, the property of CMT, and must be turned over to CMT upon demand or termination of this agreement. E. The right to sell advertising on CMT products and services and the use of the name CMT in any manner whatsoever may be terminated at anytime [sic] by either party within ten (10) days notice to the other by telegram, mailgram, or letter deposited in the U.S. Mail to the last known address.
The contract also includes a covenant not to compete for 2 years following termination. CMT does not regulate the hours that the salespeople work. The home office does not generally have contact with the field other than receiving contracts for advertising accounts. However, when the salespeople are working on a project near the home office, they may use CMT's telephones to make their sales calls. Petitioner began working for CMT as a salesperson in April, 1988. In October of that year, CMT's management asked petitioner to oversee its Oklahoma City operations. Petitioner's duties included rewriting CMT's presentation book as well as hiring and training new salespeople. CMT offered him a guaranteed weekly salary of *535 $ 250 as well as an override commission on sales generated by those he supervised. CMT also provided him with an apartment in Oklahoma City, apparently through an arrangement with one of the advertisers. Apparently this apartment was shared by other salespersons and constituted some type of "field office". Petitioner had a heart attack in December, 1988, but continued to supervise the Oklahoma City operations. Petitioner was unable, however, to solicit orders for CMT personally. In March of 1989, petitioner moved to Amarillo, Texas, for medical and family reasons, and continued to work for CMT; however, he became very ill the next month, and he ceased his sales activities. Petitioner subsequently underwent two triple-bypass surgeries, and had other medical problems stemming from his heart condition. Petitioner did not file a Federal income tax return for 1989; however, respondent prepared a substitute return for him, pursuant to section 6020(b), on May 30, 1991. Respondent determined that petitioner had $ 6,617 of income related to his trade or business as an outside salesperson, of which $ 6,585.98 was reported by CMT on Form 1099-MISC as nonemployee compensation. [2] The reported *536 amount reflects $ 6,002.93 in checks issued by CMT to petitioner and the rental value of an apartment CMT provided to petitioner in Oklahoma City. Respondent concedes that approximately $ 110 of the checks represent reimbursements by CMT to petitioner for certain expenses, and that it is not includable in petitioner's income. The remaining checks are designated as payment of commissions to petitioner. Petitioner argues that some of this amount represents the guaranteed salary paid by CMT rather than self-employment income. Otherwise, petitioner concedes that the commissions are self-employment income. He also argues that the living quarters CMT provided does not constitute income, but if it does, it was part of his salaried compensation rather than self-employment income. During the trial, petitioner's testimony indicated that he was married, that his wife had not filed a return for 1989, *537 and that the substitute return should have been filed as a joint return. Respondent prepared a decision document to this effect and sent the document to petitioner. The deficiency reflected in that document was $ 826 and an addition to tax under section 6651(a) of $ 216. Petitioner did not return that document. We treat that document as a concession by respondent that petitioner is entitled to use the rates for married persons filing jointly. DISCUSSION We note at the outset that gross income refers to all income, from whatever source derived, including compensation for services. Sec. 61(a)(1). The value of employer-provided lodging is excluded from income, but only where the employee is required to accept lodging on the employer's business premises as a condition of the employment and for the convenience of the employer. Sec. 119(a)(2). There is no suggestion in the record that the lodging arrangement complies with these requirements, and therefore the value of the lodging constitutes gross income. See McDonald v. Commissioner, 66 T.C. 223, 230-231 (1976). Turning to the question whether petitioner is subject to the tax on self-employment *538 income, we must determine whether petitioner became a common law employee of CMT. Section 1401 imposes a tax on the self-employment income of every individual for old-age, survivors, and disability insurance and for hospital insurance. The term "self-employment income" refers to the net earnings derived by the individual from self-employment in a trade or business. Sec. 1402(a) and (b); Spiegelman v. Commissioner, 102 T.C. 394, 396 (1994). "Trade or business", for purposes of self-employment income tax, has the same meaning as when used in section 162, except that it does not include the performance of service by an individual as an employee. Sec. 1402(c)(2). The definition of an employee applicable to this case is "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee". Sec. 3121(d)(2); see sec. 1402(d). This Court has enumerated seven factors that should be considered in determining whether an individual is a common law employee: (1) The degree of control exercised over the details of the work; (2) the individual's investment in the work facilities; (3) *539 the individual's opportunity for profit or loss; (4) whether the work is part of the principal's regular business; (5) the principal's right to discharge the individual; (6) the permanency of the relationship; and (7) the relationship the parties think they are creating. Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988); see also United States v. Silk, 331 U.S. 704 (1947). Although no one factor is controlling, the most fundamental is the degree of the principal's control over the details of the work. Packard v. Commissioner, 63 T.C. 621 (1975). Generally the common law employer-employee relationship exists when "the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished." Sec. 31.3121(d)-1(c)(2), Employment Tax Regs.; see also Gamal-Eldin v. Commissioner, T.C. Memo. 1988-150, *540 affd. without published opinion 876 F.2d 896 (9th Cir. 1989). As we view the facts of this case, in light of the factors enumerated above, we find that petitioner commenced work for CMT as an independent contractor. CMT and petitioner apparently believed that they created an independent contractor arrangement. CMT did not control or direct petitioner in his sales activities. Although CMT sometimes allowed the use of the home office facilities, petitioner was otherwise solely responsible for his work expenses. The parties each had the power to terminate the relationship with reasonable notice. Further, petitioner's profit or loss depended on the commissions he could generate, either through direct sales or as overrides. Petitioner argues that his employment relationship with CMT changed when he took over the Oklahoma City operations. However, the only change we can see in the relationship by the guaranteed payment is that petitioner had less risk in the profit and loss than he previously had. Although CMT "provided" petitioner with work facilities, he was ultimately responsible for their value as it was taxable income to him. Consequently, we find *541 that the income petitioner received from CMT during the latter period also was incurred in his trade or business as an independent contractor rather than as an employee. Respondent also determined an addition to tax under section 6651(a) for failure to file a tax return for 1989. If the failure did not result from "willful neglect" and was "due to reasonable cause" the addition will not be imposed. Sec. 6651(a)(1). "Willful neglect" has been interpreted to mean a conscious, intentional failure, or reckless indifference. United States v. Boyle, 469 U.S. 241, 245 (1985). "Reasonable cause" requires the taxpayer to demonstrate that ordinary business care and prudence were exercised and that, nonetheless, the taxpayer was unable to file the returns within the prescribed time. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. We are satisfied that petitioner's medical condition was a reasonable cause for petitioner's failure to file his return, and we hold that the addition to tax should not be imposed. To reflect the concessions, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The remainder came from sales petitioner performed for an insurance company at the beginning of 1989, and is not at issue.↩