# United States Tax Court

T.C. Memo. 2023-131

NICOLE DIANE HENAIRE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 1305-21.                               Filed October 30, 2023.

————

During 2017 and 2018, P was employed at the Joint Defense Facility Pine Gap (JDFPG) in Australia. When P filed her Petition, she resided in Arizona. Before she began her employment at JDFPG, P signed a closing agreement in which she waived her right to make an election under I.R.C. § 911(a) for 2016, 2017, or 2018. DP signed the closing agreement on R's behalf on May 12, 2017. The third of ten recitals in the closing agreement describes provisions in agreements entered into between the United States and Australia concerning the taxation of JDFPG employees. When P worked at JDFPG, she resided at housing provided by the Secretary of the Air Force. Among other things, the notice of deficiency determined substantial understatement penalties for P's 2017 and 2018 taxable years. The immediate supervisor of the revenue agent assigned to P's case approved those penalties in writing before the issuance to P of a "30-day letter" advising her of the determination of those penalties.

*Held*: On May 12, 2017, DP had authority to sign closing agreements in which individuals employed at JDFPG waive their right to make elections under I.R.C. § 911(a). *Smith v. Commissioner*, 159 T.C. 33 (2022), followed.

**Served 10/30/23**

[*2]      *Held, further*, R did not commit malfeasance in the execution of P's closing agreement by disclosing confidential taxpayer information in violation of I.R.C. § 6103. Any disclosure resulting from the submission of the closing agreement to the Internal Revenue Service (IRS) was attributable to P herself. Any violation of I.R.C. § 6103 that may have occurred when the IRS returned the fully executed agreement to P's employer is not grounds under I.R.C. § 7121(b) to set the agreement aside because, at that point, the agreement had already become "final and conclusive."

     *Held, further*, the third recital to the closing agreement accurately describes the provisions it purports to describe and does not include misrepresentations of material fact that would justify setting the closing agreement aside.

     *Held, further*, P was not entitled to exclude from her gross income under I.R.C. § 911(a)(1) any of the wages she received for her work at JDFPG during 2017 or 2018. In a valid closing agreement, she waived her right to make an election under I.R.C. § 911(a)(1). Moreover, because she has not established that her abode was outside the United States, she has not established that she was a "qualified individual," within the meaning of I.R.C. § 911(d)(1), during 2017 or 2018. *See* Rule 142(a)(1).

     *Held, further*, P is not entitled to exclude from her gross income under I.R.C. § 119(a) the value of the housing she was provided in Australia. She has not established that her employer provided her lodging for its own convenience, that she was required to accept those lodgings as a condition of her employment, or that the lodgings were on the employer's premises. *See* Rule 142(a)(1).

     *Held, further*, because (1) P has not established that she is a qualified individual eligible to elect the I.R.C § 911(a)(2) exclusion, (2) she waived her right to make an election under that section, and (3) the value of the housing she received does not exceed the threshold provided in I.R.C. § 911(c)(1), she is not entitled to exclude any portion

**[*3]** of that value from her gross income under I.R.C. § 911(a)(2).

 *Held, further*, P is liable for substantial understatement penalties under I.R.C. § 6662(a) and (b)(2). R met his burden under I.R.C. § 7491(c) of establishing that P had a substantial understatement of income tax for each of 2017 and 2018. R has also established timely supervisory approval of the penalties under I.R.C. § 6751(b)(1). P has not identified any communication, before the 30-day letter, of the initial determination to assess those penalties.

_____

Nicole Diane Henaire, pro se.

*Alicia E. Elliott*, *Rachael J. Zepeda*, and *Doreen M. Susi*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

 HALPERN, *Judge*: In a notice of deficiency dated December 10, 2020, respondent advised petitioner that he had determined deficiencies in her federal income tax for the taxable years ended December 31, 2017 and 2018, and had also determined accuracy-related penalties under section 6662(a)[1] for the same years. Petitioner filed a timely Petition for redetermination. We must decide (1) whether petitioner is entitled to exclude from her gross income, under section 911(a)(1), $102,100 of the wages she received for services performed in 2017 for Northrop Grumman Corp. International (Northrop Grumman) at the Joint Defense Facility Pine Gap (JDFPG) in Australia, and $103,900 of the wages she received for services performed in 2018 at JDFPG, (2) whether petitioner is entitled to exclude, under either section 119(a) or 911(a)(2), any of the value of housing she was provided near JDFPG,

_____

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect for the years in issue, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect for those years, and Rule references are to the Tax Court Rules of Practice and Procedure in effect at the relevant times.

**[\*4]** and (3) whether petitioner is liable for the accuracy-related penalties determined in the notice of deficiency.

FINDINGS OF FACT

Petitioner resided in Gilbert, Arizona, when she filed her Petition in this case. During 2017 and 2018, however, she was employed by Northrop Grumman at JDFPG. She moved to Australia on January 4, 2017, and began work at Northrop Grumman two days later. Petitioner remained in Australia through the rest of 2017 except for a visit to the United States from April 17 to April 30. Petitioner again visited the United States from March 12 to March 28, 2018, and from October 18 to October 28 of that year.

Before she began her employment with Northrop Grumman, petitioner signed a closing agreement in which she waived her right to make an election under section 911(a) for the taxable years ended December 31, 2016, 2017, and 2018.[2] After petitioner signed the closing agreement, an official at Northrop Grumman mailed it to the Internal Revenue Service (IRS). Petitioner's closing agreement was signed on the Commissioner's behalf on May 12, 2017, by Deborah Palacheck, then the Director, Treaty Administration of the IRS.

Section (a)(1) of the closing agreement provides that petitioner "shall not at any time during or after . . . her presence in Australia make any election under code section 911(a) with respect to income paid or provided to [her] as consideration for services performed for the employer at the JDFPG in Australia." Section (a)(2) of the agreement provides that petitioner "irrevocably waives and foregoes any right that . . . she may have to make any election under Code section 911(a) with respect to income paid or provided to [her] as consideration for services performed for the employer at the JDFPG in Australia."

Before its operative provisions, the closing agreement includes ten recitals. The first recital refers to petitioner's status as a U.S. citizen and her employment at JDFPG. The second recital refers to the

---

[2] Section 911(a) provides:

At the election of a qualified individual (made separately with respect to paragraphs (1) and (2)), there shall be excluded from the gross income of such individual, and exempt from taxation under this subtitle, for any taxable year—
    (1) the foreign earned income of such individual, and
    (2) the housing cost amount of such individual.

[*5] taxation, under Australian law, of "any wages, allowances, benefits and other emoluments paid or provided to [petitioner] as consideration for services performed for the employer in Australia," which the agreement labels "income." The third recital reads as follows:

> WHEREAS Article 9 and Article X of the Agreements between the Government of the United States of America and the Government of the Commonwealth of Australia relating to the establishment of a Joint Defense Space Research Facility and a Joint Defense Space Communications Station, effective December 9, 1966, and November 10, 1969, respectively, provide that such income shall be deemed not to have been derived in Australia, provided it is not exempt and is brought to tax, under the taxation laws of the United States.

In November 2018, petitioner signed three addenda to her closing agreement in which she consented to the disclosure of specified return information related to the matters addressed in the agreement.

In addition to her closing agreement, petitioner also entered into an International Assignment Agreement with Northrop Grumman concerning her employment. Among other things, that agreement addresses petitioner's housing during her employment. It states: "You will be provided with Government furnished housing in accordance with Site policy. The Site Housing Board assigns housing to all personnel, with the individual having no choice in the assignment and selection of the house." The agreement also states: "If you elect not to live in the Government furnished housing, you are entitled to a housing allowance of $11,000 per year." During her time in Australia, petitioner lived in Alice Springs, a town about 10 miles away from JDFPG. Her housing was provided at no cost to her.

Petitioner did some work for Northop Grumman at her home in Alice Springs. Northrop Gruman gave her a key fob that allowed her to access its computers from home. According to petitioner's testimony at trial, she did "all of [her] training work" at home.

Petitioner filed her original 2017 return on or before April 15, 2018, in a manner consistent with the closing agreement she signed. On line 7 of her return, she reported wages of $121,865. The parties stipulated that that amount "consists of $107,981 in wages for services [petitioner] performed for Northrop Grumman at JDFPG and $13,884

[*6] from the Secretary of the Air Force." A Form 1099–MISC, Miscellaneous Income, from the Secretary of the Air Force describes the latter amount as "nonemployee compensation." A letter explaining the Form 1099–MISC states that the reported amount was the value of government-owned housing provided to petitioner. Petitioner's 2017 return as originally filed showed a tax of $25,519.

In October 2018, petitioner filed an amended return for 2017 in which she reported wages of $107,981 and other income of −$102,100. An accompanying statement describes the other income amount as an exclusion from Form 2555, Foreign Earned Income.[3] Petitioner's 2017 amended return includes a Schedule C, Profit or Loss From Business, for a purported business of petitioner's as a contractor. The Schedule C shows gross receipts or sales of $13,884, the value of the government-provided housing petitioner received. The schedule shows an expense in the same amount on line 14, captioned "Employee benefit programs." Thus, the Schedule C shows net profit or loss of zero. Although petitioner filed a Schedule C with her 2017 return, she conceded at trial that she was not self-employed either during 2017 or 2018. After petitioner filed her amended return for 2017, she received a refund of $25,170.

Petitioner filed her 2018 return on or before April 15, 2019, reporting a foreign earned income exclusion of $103,900.[4] Petitioner received a Form 1099–MISC from the Secretary of the Air Force for 2018 reporting nonemployee compensation of $9,665.67. Petitioner did not report that amount as income on her 2018 return. That return showed tax of $195.

According to Form 4549–A, Report of Income Tax Examination Changes, included with the notice of deficiency, respondent made three adjustments to petitioner's taxable income in computing her 2017 deficiency. First, he disallowed the $13,884 employee benefit deduction petitioner reported on Schedule C. Second, he increased petitioner's income by $102,100, the amount petitioner effectively excluded by reporting a negative amount of other income to offset the wage income

---

[3] A qualified individual's excludable foreign earned income cannot exceed the "exclusion amount," § 911(b)(2)(A), which is $80,000 adjusted for inflation for years after 2005, § 911(b)(2)(D)(i) and (ii). For 2017, the exclusion amount was $102,100. Rev. Proc. 2016-55, § 3.34, 2016-45 I.R.B. 707, 714.

[4] The reported exclusion equaled the exclusion amount under section 911(b)(2)(D)(i) for 2018. *See* Rev. Proc. 2018-18, § 3.34, 2018-10 I.R.B. 392, 397.

**[*7]** she reported. And third, respondent allowed petitioner a deduction under section 164(f) of $517, an amount equal to half of the $1,033 self-employment tax he determined. On the basis of those adjustments, respondent determined that petitioner's total corrected tax liability for 2017 was $26,407.

The Form 4549–A also shows three adjustments to petitioner's taxable income for 2018. First, respondent increased petitioner's taxable income by the $103,900 she excluded under section 911(a)(1). Second, he increased her taxable income by the $9,665 reported on the Form 1099–MISC issued to petitioner by the Secretary of the Air Force. And third, respondent allowed petitioner a deduction of $683 under section 164(f), an amount equal to one-half of the $1,366 self-employment tax he determined. On the basis of those adjustments, respondent determined that petitioner's total corrected tax liability for 2018 was $22,943.

The parties stipulated that Revenue Agent Kimberly Parks "made the initial determination to assert the substantial understatement penalty under section 6662(b)(2) and 6662(d) against petitioner for the taxable years 2017 and 2018." They also stipulated that "[o]n June 2, 2020, Doris DeLellis personally approved, in writing, the proposed substantial understatement penalty for the taxable years 2017 and 2018." They stipulated that, on the date Ms. DeLellis approved the penalties, she was "Agent Parks's immediate supervisor." And they stipulated that, "[o]n June 3, 2020, Agent Parks mailed a Letter 950, commonly referred to as a '30-day letter,' to petitioner for the taxable years 2017 and 2018, which had enclosed an examination report that included the proposed substantial understatement penalty."

OPINION

I.  *Exclusion of Petitioner's JDFPG Wages Under Section 911(a)(1)*

Section 911(a)(1) allows a "qualified individual" (as defined in section 911(d)(1)) to elect to exclude from her gross income her "foreign earned income." Under section 911(b)(2)(A), a qualified individual's foreign earned income cannot exceed the "exclusion amount." Petitioner claims that she is entitled to exclude from her gross income, under section 911(a)(1), that portion of the wages she received from Northrop Grumman in each of the years in issue that did not exceed the exclusion amount for the year. To prevail in that claim, petitioner must establish, first, that the closing agreement in which she waived her right to make

**[*8]** an election under section 911(a)(1) was invalid and, second, that she was a qualified individual for each of the years in issue. For the reasons explained below, we conclude that petitioner has not established either of the predicates necessary for the section 911(a)(1) exclusion to have been available to her. *See* Rule 142(a) (providing as a general rule that the taxpayer bears the burden of proof).

### A.     *Validity of Petitioner's Closing Agreement*

Under section 7121(b)(1), once a closing agreement is approved by the Secretary or her delegate[5] the agreement is "final and conclusive . . . except upon a showing of fraud or malfeasance, or misrepresentation of a material fact." Petitioner contends that her closing agreement was not valid and enforceable. She offers three arguments in support of that position. First, she asserts that Ms. Palacheck lacked the authority to have signed the agreement on respondent's behalf. Second, she claims that the IRS committed malfeasance by disclosing confidential taxpayer information in violation of section 6103(a). And third, she complains of a misrepresentation in one of the recitals in her closing agreement.

### 1.     *Ms. Palacheck's Authority to Sign Petitioner's Closing Agreement*

In *Smith v. Commissioner*, 159 T.C. 33 (2022), we upheld the validity of a closing agreement in which another employee of a U.S. defense contractor working at JDFPG waived his right to elect either of the exclusions provided in section 911(a). Ms. Palacheck signed the closing agreement at issue in *Smith* on the same day that she signed petitioner's closing agreement. Like petitioner, the taxpayer in *Smith* argued, among other things, that Ms. Palacheck lacked the authority to sign his closing agreement. We disagreed, concluding that "Ms. Palacheck . . . acted within her delegated authority when she signed [the taxpayer's] Closing Agreement." *Smith*, 159 T.C. at 53. If Ms. Palacheck had the authority to sign the closing agreement at issue in *Smith*, she also had the authority to sign on the same day an agreement with petitioner providing the same terms. In short, *Smith* is

---

[5] Section 7701(a)(11)(B) defines "Secretary" to mean "the Secretary of the Treasury or his [or her] delegate." The term "delegate," "when used with reference to the Secretary of the Treasury, means any officer, employee, or agency of the Treasury Department duly authorized by the Secretary of the Treasury directly, or indirectly by one or more redelegations of authority, to perform the function mentioned or described in the context." § 7701(a)(12)(A)(i).

**[\*9]** controlling authority on the issue of Ms. Palacheck's authority to sign petitioner's closing agreement.

Because we had not yet issued our opinion in *Smith* when petitioner filed her Seriatim Opening Brief on July 11, 2022, petitioner did not address (and could not have addressed) that opinion in her brief. But the arguments she makes on brief give us no reason to question our conclusion in *Smith*. To the extent that we did not explicitly consider in *Smith* the precise arguments petitioner makes here, our analysis in that case nonetheless forecloses petitioner's arguments.

We concluded in *Smith* that Delegation Order 4-12 (Rev. 3), *Internal Revenue Manual* (IRM) 1.2.43.12(14) and (15) (Sept. 7, 2016), gave Ms. Palacheck the authority to have signed the closing agreement in issue. Paragraph (14) of the delegation order describes the delegated authority as follows:

> To act as "competent authority" or "taxation authority" under the tax treaties, tax information exchange agreements, and FATCA intergovernmental agreements of the United States and tax coordination agreements and tax implementation agreements with the territories of the United States with respect to specific applications of such treaties and agreements, including signing mutual and other agreements on behalf of the Commissioner, LB&I, except as otherwise specifically delegated in this delegation order.

Paragraph (15) delegates that authority to the Director, Advance Pricing and Mutual Agreement and the Director, Treaty Administration, "for cases and issues under their jurisdiction."

Petitioner characterizes the delegated authority as "narrowly tailored" in that it allows the delegates to address specific applications of five types of agreements: tax treaties, tax information exchange agreements, FATCA intergovernmental agreements, tax coordination agreements, and tax implementation agreements. As petitioner acknowledges, "the United States and Australia have entered into an income tax treaty." *See* Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Austl.-U.S., Aug. 6, 1982, 35 U.S.T. 1999 (1982 Treaty). The two countries also entered into two agreements that specifically address the taxation of employees at JDFPG: one in 1966 and the other in

**[\*10]** 1969.[6] Petitioner argues that Delegation Order 4-12 (Rev. 3) did not authorize Ms. Palacheck to sign her closing agreement because that agreement "stems from the Pine Gap Agreement."

While we recognized in *Smith* that "the Pine Gap Agreements and Australian law" were relevant in "[d]etermining the appropriate result for a taxpayer in Mr. Smith's position," we also viewed the 1982 Treaty as relevant. *Smith*, 159 T.C. at 53. We therefore "conclude[d] that (1) Ms. Palacheck signed [the taxpayer's] Closing Agreement while acting as the competent authority under the 1982 Treaty with respect to a specific application of that treaty and (2) that action is within the scope of authority delegated to her as Director, Treaty Administration." *Id.* at 55. *Smith* thus disposes of petitioner's argument that Ms. Palacheck lacked authority to sign the closing agreement in issue because it stemmed from the Pine Gap Agreements and not the 1982 Treaty.

Next, petitioner suggests that her closing agreement was not a "mutual agreement." According to petitioner, "mutual agreements [are] agreements entered into between two sovereign states." If petitioner were correct, it would follow that a closing agreement between the IRS and a taxpayer would not be a "mutual agreement." But Ms. Palacheck's authority under Delegation Order 4-12 was not limited to signing "mutual agreements" that involve specific applications of a treaty. Instead, she had authority to sign "mutual *or other* agreements." Petitioner offers no argument why her closing agreement was not an agreement *other than* a mutual agreement that involved "a specific application of the 1982 Treaty."[7]

Finally, petitioner views Delegation Order 8-3, IRM 1.2.47.4 (Aug. 18, 1997), as a more specific authority than Delegation Order 4-12 regarding the delegation of authority to sign closing agreements. Therefore, she reasons, Delegation Order 8-3, which did not grant authority to sign closing agreements to the Director, Treaty

---

[6] Agreement Relating to the Establishment of a Joint Defence Space Research Facility, Austl.-U.S., Dec. 9, 1966, 17 U.S.T. 2235 (Pine Gap I); Agreement Relating to the Establishment of a Joint Defense Space Communications Station in Australia, Austl.-U.S., Nov. 10, 1969, 20 U.S.T. 3097 (Pine Gap II).

[7] In *Smith*, 159 T.C. at 55–56 (quoting *Fort Howard Corp. & Subs. v. Commissioner*, 103 T.C. 351 (1994), *supplemented by* 107 T.C. 187 (1996)), we read the term "other" in its "ordinary, everyday sense" and concluded that the reference in Delegation Order 4-12 (Rev. 3) to "other agreements" "refer[s] to agreements different from mutual agreements."

**[*11]** Administration, should take precedence over Delegation Order 4-12. In *Smith*, 159 T.C. at 57, we explicitly rejected the argument that "delegations of authority to enter into closing agreements are contained exclusively within Delegation Order 8-3." "[M]utual delegations of authority," we wrote, "are not only permissible, but occur regularly." *Id.* at 58.

In short, *Smith* governs the determination of whether Ms. Palacheck had authority to sign petitioner's closing agreement and compels the conclusion that she did. Petitioner's arguments give us no grounds to reconsider our conclusion in *Smith* that, on May 12, 2017, Ms. Palacheck, as Director, Treaty Administration, had authority to sign closing agreements in which a U.S. taxpayer employed at JDFPG waived his or her right to elect the section 911(a) exclusion.

### 2. *Respondent's Alleged Malfeasance*

Petitioner argues that "[t]he IRS committed malfeasance when they [sic] procured the Closing Agreement through a third party, Petitioner's employer, and thereby disclosed confidential information." Those alleged disclosures, petitioner contends, violated section 6103, which requires that "[r]eturns and return information" be kept confidential.[8]

How and when did disclosures occur in violation of section 6103? Petitioner provides three examples: First, she says, "the IRS committed the textbook definition of malfeasance, when IRS disclosed to Petitioner's employer that the IRS was requesting a Closing Agreement from Petitioner." Second, "[t]he IRS further violated IRC § 6103(a) when the IRS obtained the Closing Agreement through Petitioner's employer." "And finally," petitioner alleges, "the IRS violated IRC § 6103(a) when IRS then used Petitioner's employer as an agent to return the executed Closing Agreement back to Petitioner."

The record does not support petitioner's claims that the IRS requested a closing agreement from her, disclosed that request to Northrop Grumman, and, in so doing, disclosed to Northrop Grumman information protected by section 6103(a). Petitioner proposes no findings of fact to that effect and her brief fails to cite any evidence in the record to support her claims.

---

[8] "[A] taxpayer's identity" is "return information." § 6103(b)(2)(A). So is "any agreement under section 7121." § 6103(b)(2)(D).

**[\*12]** Our opinion in *Smith* requires rejection of petitioner's second and third arguments regarding section 6103(a). In *Smith*, as in petitioner's case, the taxpayer's employer provided the closing agreement in issue to the IRS after it had been signed by the taxpayer. We accepted in *Smith* that that action might have resulted in the disclosure of protected information—for example, the taxpayer's name, address, and Social Security number. Any such disclosure, however, "was attributable to Mr. Smith and not to the IRS." *Smith*, 159 T.C. at 67. Consequently, the actions in question did not violate section 6103:

> We fail to see how an action taken by Mr. Smith himself, in the absence of any affirmative action whatsoever by the IRS, could violate section 6103. The IRS did not disclose anything when Mr. Smith submitted the half-signed agreement; it merely received the document from Raytheon [Mr. Smith's employer], which had received it from Mr. Smith. We therefore conclude that the IRS's receipt of the half-signed 2016–18 Closing Agreement from Raytheon did not violate section 6103 and does not constitute malfeasance.

*Smith*, 159 T.C. at 67–68 (footnote omitted).

The taxpayer in *Smith* also argued "that malfeasance occurred when the IRS sent the fully executed 2016–18 Closing Agreement back to Raytheon." *Id.* at 68. "[T]he execution of the agreement itself," we wrote, "preempted" that argument. *Id.* "Mr. Smith cannot be said to have been induced into executing the 2016–18 Closing Agreement," we reasoned, "by an action taken *after* the agreement had become 'final and conclusive' under section 7121." *Id.* (emphasis added). "Any malfeasance occurring after the validity (and finality) of a closing agreement is established," we concluded, "is no ground to set it aside." *Id.*

Petitioner devotes considerable attention to three Consent to Disclosure forms that she signed, by which, she alleges, "the IRS attempted to remedy their [sic] illegal acts." Petitioner acknowledges, however, that she did not sign the Consent to Disclosure forms until "nearly two years after" the alleged violations of section 6103. Therefore, whether the Consent to Disclosure Forms were invalid, as petitioner claims, has no bearing on the enforceability of her closing agreement. Petitioner suggests that what she describes as "[t]he IRS's poor attempt to obtain authorization after the violation occurs further

**[\*13]** shows the IRS's malfeasance." Petitioner seems to view the request for the consents as admissions of malfeasance. Even if we were to accept them as such, the malfeasance would not be grounds for setting petitioner's closing agreement aside because the only possible violation of section 6103 occurred after the agreement became final and conclusive with Ms. Palacheck's signature.

Petitioner claims that "[n]o weight should be given to any potential argument that any IRC § 6013 [sic] post-signature violation does not invalidate an executed Closing Agreement." Petitioner made that claim in the brief she submitted before the issuance of our opinion in *Smith*. The argument she seeks to dismiss is not "potential." As *Smith* confirms, it is the law.

### 3. *Misrepresentation*

Next, petitioner claims that her closing agreement "must be annulled, set aside, or disregarded based on [a] material misrepresentation." In support of her claim, petitioner quotes the agreement's third recital (which she refers to as its "second preamble"), regarding specified provisions of Pine Gap I and Pine Gap II.

Immediately after quoting the closing agreement's third recital, petitioner argues: "Portraying on the face of the Closing Agreement that the execution of the Closing Agreement and foregoing a domestic U.S. tax right is required to avoid Australian taxation is a material misrepresentation of U.S. law with the intent to induce Petitioner to sign the Closing Agreement." The third recital, however, says nothing about the need to waive a "domestic U.S. tax right" in order "to avoid Australian taxation." The recital, again, reads as follows:

> WHEREAS Article 9 and Article X of the agreements between the Government of the United States of America and the Government of the Commonwealth of Australia relating to the establishment of a Joint Defense Space Research Facility and a Joint Defense Communications Station, effective December 9, 1966, and November 10, 1969, respectively, provide that such income shall be deemed not to have been derived in Australia, provided it is not exempt, and is brought to tax, under the taxation laws of the United States.

The recital accurately describes the cited provisions of the Pine Gap Agreements. Article 9(1) of Pine Gap I, 17 U.S.T. 2238, provides:

**[\*14]** Income derived wholly and exclusively from performance in Australia of any contract with the United States Government in connection with the facility by any person or company (other than a company incorporated in Australia) being a contractor, sub-contractor, or one of their personnel, who is in or is carrying on business in Australia solely for the purpose of such performance, shall be deemed not to have been derived in Australia, provided that it is not exempt, and is brought to tax, under the taxation laws of the United States.

Pine Gap II contains a substantially identical provision. *See* Pine Gap II, art. X(1), 20 U.S.T. at 3100.

Petitioner argues that "Article 9 of the Pine Gap Agreement [apparently a reference to Pine Gap I] infringes on Congressional powers." "The Pine Gap Agreement," she contends, "cannot alter or override U.S. statutory law and deprive U.S. citizens of the rights awarded to them by the Congressional enacted [sic] IRC § 911."

Article 9 of Pine Gap I has no apparent effect on U.S. tax law. It provides only that *if*, under U.S. law, income is not exempt but instead subject to U.S. tax, it will be deemed not to have been derived in Australia. The U.S. tax treatment of the income is the same as it would have been in the absence of Article 9. Article 9 does not alter the U.S. tax treatment. It leaves entirely to "Congressional[ly] enacted" U.S. law the issue of whether the income in question is subject to tax in the United States.

Petitioner has not advanced a valid argument for setting her closing agreement aside on the grounds of misrepresentation. A misrepresentation justifies invalidating a closing agreement only if the misrepresentation is "of a material fact." § 7121(b). The recital (or preamble) of which petitioner complains purports to make a factual statement: It describes what the Pine Gap Agreements provide. But petitioner points to no respect in which that description is inaccurate: The Pine Gap Agreements say what the recital says they say.

Petitioner's complaint seems to be that the waiver of her right to elect either or both of the section 911(a) exclusions was unnecessary for her Pine Gap wages to be treated as "not exempt" and "brought to tax" in the United States. She suggests that income excluded from a taxpayer's gross income under section 911(a) is not exempt from U.S.

**[\*15]** tax because that income enters into the calculation of the taxpayer's U.S. tax liability and may (by moving her into a higher tax bracket) increase the tax she is required to pay on income not excluded under section 911(a). *See* § 911(f). Petitioner may or may not be correct about when Australian law considers income exempt from tax in another country. But that is a question of law—not one of fact. Even if an IRS official had told petitioner, before she signed the closing agreement, that she had to agree to waive her right to make an election under section 911(a) to avoid Australian tax on her wages, and even if that statement did not accurately reflect the relevant Australian law, petitioner *still* would not have grounds under section 7121(b) to set aside the closing agreement. Again, a misrepresentation justifies invalidating a closing agreement only if the misrepresentation misstates a material fact. Misrepresentations of law do not provide grounds under section 7121(b) to set a closing agreement aside. *Smith*, 159 T.C. at 71.

B. *Petitioner's Status as a Qualified Individual Within the Meaning of Section 911(d)(1)*

Regardless of the validity of petitioner's closing agreement, she was not entitled to exclude from her gross income under section 911(a)(1) any of the wages she received from Northrop Grumman for her work at JDFPG during 2017 or 2018 because she has not established that she was, during those years, a "qualified individual," within the meaning of section 911(d)(1).

Section 911(d)(1) provides:

The term "qualified individual" means an individual whose tax home is in a foreign country and who is—
>    (A) a citizen of the United States and establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, or
>    (B) a citizen or resident of the United States and who, during any period of 12 consecutive months, is present in a foreign country or countries during at least 330 full days in such period.

Respondent accepts that petitioner satisfied the physical presence test of section 911(d)(1)(B). He argues, however, that

**[\*16]** "petitioner has not established that her 'tax home' was in Australia." We agree.

An individual's tax home is his or her "home for purposes of section 162(a)(2) (relating to traveling expenses while away from home)." § 911(d)(3). Therefore, an individual's tax home "is generally 'the vicinity of the taxpayer's principal place of employment and not where his or her personal residence is located.'" *Wentworth v. Commissioner*, T.C. Memo. 2018-194, at \*17 (quoting *Mitchell v. Commissioner*, 74 T.C. 578, 581 (1980)). But "[a]n individual shall not be treated as having a tax home in a foreign country for any period for which his abode is within the United States." § 911(d)(3).

Petitioner argues that, because her "principal place of employment was in Alice Springs, Australia . . . her tax home was Australia for 2017 and 2018." We agree that, if Australia had been petitioner's principal place of business, it would have been her "home for purposes of section 162(a)." Even so, if she nonetheless maintained her "abode . . . within the United States," Australia could not have been her tax home. Petitioner has not addressed the location of her abode.

While section 162(a) focuses on the taxpayer's principal place of employment, the concept of "abode" looks to a taxpayer's "familial, economic, and personal ties." *Wentworth*, T.C. Memo. 2018-194, at \*18. "Thus, 'abode' has a domestic rather than vocational meaning . . . ." *Id.* (quoting *Bujol v. Commissioner*, T.C. Memo. 1987-230, Tax Ct. Memo LEXIS 234, at \*8–9, *aff'd*, 842 F.2d 328 (5th Cir. 1988)). The considerations relevant to determining a taxpayer's abode "include property ownership, community involvement, banking activity, recreational activities, the amount of time the taxpayer spent in each location, and the residence of the taxpayer's family." *Id.* at \*19.

Under section 911(d)(3), therefore, the foreign country that is a taxpayer's principal place of employment does not qualify as the taxpayer's tax home if the taxpayer maintains sufficiently strong familial, economic, or personal ties to the United States. *Haskins v. Commissioner*, T.C. Memo. 2019-87, *aff'd per curiam*, 820 F. App'x 994 (11th Cir. 2020), exemplifies such a case. The wife of the couple involved in *Haskins* had served in the U.S. Army in Afghanistan. After she retired from the Army, she returned to Afghanistan and worked on military bases there as an employee of Science Applications International Corp. The Commissioner conceded (as he does in the case before us) that the taxpayer met the 330-day physical presence test

**[\*17]** provided in section 911(d)(1)(B). It was also "uncontested that [the taxpayer's] principal place of employment during the relevant periods was in Afghanistan." *Haskins*, T.C. Memo. 2019-87, at *17. Therefore, the taxpayer's eligibility for the foreign earned income exclusion turned on whether "her abode was in the United States." *Id.*

We concluded that it was. The taxpayer's husband and two children lived in the United States. So did her mother. "When her mother was diagnosed with cancer, [the taxpayer] returned to the United States." *Id.* at *18. While the taxpayer worked in Afghanistan, she "did not have strong nonwork ties" there. *Id.* "[S]he worked and lived on forward operating bases," which she could not leave because of security threats. *Id.* On the basis of those facts, we concluded that the taxpayer's "abode was in the United States during the relevant period." *Id.* at *19.

As noted, we agree with respondent that "[p]etitioner has not met [her] burden" of proving "that her tax home was in Australia." None of petitioner's proposed findings of fact is explicitly directed to the question of her abode, which is perhaps not surprising given that she makes no argument that her abode was not in the United States. And we find insufficient evidence in the record to support a conclusion that petitioner's abode was elsewhere.

Petitioner did make multiple visits to the United States, but we are unable to assess their relevance without knowing more about her trips than the record discloses. In particular, we do not know the purpose of petitioner's visits or whom she stayed with while in the United States. Those visits tend to indicate, though, that she retained at least some ties to the United States while she worked in Australia.

The record also fails to disclose whether petitioner maintained a driver's license or bank accounts in the United States during the years in issue or whether she owned property here during that time. Did she maintain community ties in the United States through involvement, for example, in civic or religious organizations? Again, the record does not provide answers.

Given the paucity of the record, we conclude that petitioner has not met her burden under Rule 142(a) of establishing that her abode during the years in issue was not in the United States. Consequently, she has not established that, during those years, her tax home was in Australia and that she was a qualified individual within the meaning of

**[\*18]** section 911(d)(1) entitled, if her closing agreement was invalid, to elect to exclude her foreign earned income from her gross income under section 911(a)(1).

C.    *Conclusion*

Petitioner was not entitled to exclude from her gross income under section 911(a)(1) any portion of the wages she received from Northrop Grumman for her work at JDFPG during the years in issue unless she made a valid election under that section. She signed a closing agreement waiving her right to make such an election for either of the two years in issue. Although she challenges the validity of that agreement on multiple grounds, we have rejected her challenges and concluded that her closing agreement was valid and enforceable. Moreover, we have also concluded that petitioner has not established that she was a qualified individual within the meaning of section 911(d)(1) and thus would have been entitled, but for the closing agreement, to have elected the section 911(a)(1) exclusion. We therefore conclude that petitioner was not entitled under section 911(a)(1) to exclude from her gross income that portion of the wages she received from Northrop Grumman for her work at JDFPG for each year that did not exceed the exclusion amount for the year. Petitioner offers no other grounds to exclude from her gross income any portion of her wages. We thus conclude that the wages petitioner received from Northrop Grumman for each of the years in issue are includible in her gross income for the year.

II.    *Petitioner's Government-Provided Housing*

Petitioner was inconsistent in her treatment of the value of the housing she received from the U.S. Air Force. On her amended 2017 return, she reported as income the value of the housing she received during that year but also claimed an offsetting deduction. Her 2018 return, by contrast, does not report the value of her government-provided housing.

On brief, petitioner first claims that she "can deduct the housing value under IRC § 911, even though the U.S. Government directly paid the amount," or, "[a]lternatively, [she] can deduct the amount under IRC § 119."

**[\*19]**  A.  *Section 119*

Section 119 provides for an exclusion—not a deduction.  In particular, section 119(a) allows an employee to exclude from gross income the value of any lodging furnished to her by or on behalf of her employer, for the employer's convenience, if "the employee is required to accept such lodging on the business premises of [her] employer as a condition of [her] employment."

Even assuming that the Secretary of the Air Force provided housing to petitioner on Northrop Grumman's behalf, to qualify for the section 119 exclusion petitioner has to establish that the housing was provided on Northrop Grumman's premises and that she was required to accept the housing as a condition of her employment.  Petitioner acknowledges that "one sentence" in the International Assignment Agreement governing her employment with Northrop Grumman "indicates that [she] need not accept" the offer of government-provided housing.  She emphasizes, however, that "individuals do not have a choice in picking their homes."  That an employee could not choose a particular house were she to accept government-provided housing does not establish that she was required to accept government-provided housing in the first place.

That petitioner "was not expressly required to accept the [government-provided] accommodations . . . is not determinative."  *See McDonald v. Commissioner*, 66 T.C. 223, 231 (1976).  Instead, our caselaw "focus[es] on whether, as a practical matter 'the employee's occupancy of the lodging furnished by his employer is necessary . . . for the employee to perform properly the duties he is employed to perform."  *Id.* (quoting *Heyward v. Commissioner*, 36 T.C. 739, 744 (1961), *aff'd*, 301 F.2d 307 (4th Cir. 1962)).

Northrop Grumman's offer of a housing allowance, in lieu of government-provided housing, demonstrates that petitioner's residing in government-provided housing was not necessary for her to perform the duties of her job.  JDFPG may be, as petitioner describes it, in "an extremely remote area."  But the facility is about 10 miles from Alice Springs, the town in which petitioner was provided with housing.  Perhaps it would have been difficult for petitioner to secure alternative housing in Alice Springs or elsewhere.  But if she *had* been able to find alternative housing, Northrop Grumman's offer of an allowance to help pay for that housing indicates that it would not have objected to her living elsewhere than the government housing she was provided.  Her

**[\*20]** residing in government-provided housing thus was unnecessary for her to perform her duties. Instead, the offer of that housing was apparently made for *her* convenience rather than Northrop Grumman's.

Moreover, petitioner would be eligible for the section 119(a) exclusion only if the lodging she was provided was on Northrop Grumman's "premises." Petitioner's testimony establishes that the home in which she lived in Alice Springs was not at JDFPG; it was instead about 10 miles away.

Petitioner argues that she "was required to complete work from home and was on call 24/7." Her suggestion seems to be that, because she occasionally worked from home, her home was part of Northrop Grumman's "business premises."

Treasury Regulation § 1.119-1(c)(1) provides: "[T]he term 'business premises of the employer' generally means the place of employment of the employee." But this Court (perhaps focusing on the qualifying adverb) has recognized that an employer's "business premises are not defined solely in terms of the employee's place of employment." *McDonald*, 66 T.C. at 230. Instead, the employer's business premises "may include housing where the employee performs a significant portion of his duties." *Id.*

On at least three occasions, we have addressed the availability of the section 119 exclusion to JDFPG employees. *See Smith v. Commissioner*, T.C. Memo. 2023-6; *Middleton v. Commissioner*, T.C. Memo. 2008-150; *Hargrove v. Commissioner*, T.C. Memo. 2006-159, 2006 WL 2280631. In each case, we concluded that the employee had not established that the employer-provided lodging was part of the employer's business premises.

Petitioner argues that her case is distinguishable from *Hargrove* and *Middleton* in that, unlike the taxpayers in those cases, she performed some work-related activities at home.[9] Like the taxpayer in *Smith*, petitioner has not established *how much* work she did at home. Therefore, she has not established that any differences between her case and *Middleton* or *Hargrove* require a different result. The record does not establish the portion of petitioner's duties she fulfilled at home. Therefore, petitioner has not established that she performed a

---

[9] Petitioner did not address *Smith*, T.C. Memo. 2023-6, because we issued our opinion in that case only after she filed her Seriatim Opening Brief.

[*21] "significant portion" of her employment duties at her residence so that her residence was an "integral part" of Northrop Grumman's business property. *McDonald*, 66 T.C. at 230; *Hargrove v. Commissioner*, 2006 WL 2280631, at *4.

In sum, petitioner has not established that she met *any* of the three conditions necessary for the value of her government-provided housing to be excluded from her gross income under section 119. She has not established that Northrop Grumman provided her lodgings for its own convenience, that she was required to accept those lodgings as a condition for her employment, or that the lodgings were on Northrop Grumman's premises.

B.      *Section 911(a)(2)*

What we have already said establishes that petitioner is not entitled to exclude from her gross income under section 911(a)(2) any portion of the value of the housing she was provided. First, like the foreign earned income exclusion of section 911(a)(1), the exclusion for housing costs provided in section 911(a)(2) is available only to qualified individuals who elect the exclusion. As explained above, petitioner has not established that her abode was not within the United States during the years in issue. Consequently, she has not established that her tax home was in a foreign country or that she was a qualified individual, within the meaning of section 911(d)(1), during the years in issue.

Second, petitioner signed a closing agreement in which she waived her right to elect either exclusion for the taxable years in issue. We have concluded that the official who signed petitioner's closing agreement on behalf of the IRS had the authority to do so and that the agreement cannot be set aside under any of the grounds cognizable by section 7121(b).

But there is yet a third reason why petitioner cannot exclude under section 911(a)(2) any of the value of the housing she was provided in Alice Springs while working at JDFPG. Section 911(a)(2) allows a qualified individual to elect to exclude the individual's "housing cost amount." Section 911(c)(1) defines housing cost amount as the excess of an individual's housing expenses[10] over a prescribed threshold. The

---

[10] An individual's housing expenses include amounts "paid or incurred during the taxable year by or on behalf of [the] individual." § 911(c)(3)(A). Therefore, if Northrop Grumman paid the U.S. Air Force for the value of the housing provided to

**[\*22]** threshold generally equals 16% of the limit on the foreign earned income exclusion. The threshold is prorated, however, if the taxable year includes periods during which the qualified individual was not a bona fide resident of a foreign country or did not meet the 330-day test provided in section 911(d)(2)(B). Petitioner claims, and respondent accepts, that she satisfied the 330-day test from her entry into Australia through the end of 2018. Therefore, the appliable thresholds for determining petitioner's housing cost amounts are $16,157 for 2017 ($102,100 × 0.16 × 361/365) and $16,624 for 2018 ($103,900 × 0.16).[11] For each year, the applicable threshold exceeds the value of the housing petitioner received ($13,884 for 2017 and $9,667.67 for 2018).[12] Therefore, even if petitioner were a qualified individual who validly elected the section 911(a)(2) exclusion with her 2017 amended return, her excludable housing cost amount for each year would be zero.

III.  *Penalties*

Section 6662(a) provides for an accuracy-related penalty of 20% of the portion of a taxpayer's "underpayment" that is attributable to one of eight grounds listed in section 6662(b). The potential grounds for an accuracy-related penalty include "[n]egligence or disregard of rules or regulations" and "[a]ny substantial understatement of income tax." As noted at the outset, the notice of deficiency determined accuracy-related penalties for each of the years in issue but did not identify the basis for the penalty. In his answering brief, however, respondent clarifies that he "determined that petitioner is liable for substantial understatement penalties for the tax years at issue pursuant to sections 6662(a) and (d)."

Very generally, a taxpayer has an "understatement of income tax" for a taxable year if the tax required to be shown on the taxpayer's return exceeds the tax actually shown on the return. *See*

---

petitioner, that amount could be includible in petitioner's housing expenses for the purpose of determining her housing cost amount.

[11] Respondent would reduce the applicable thresholds for periods during which petitioner was outside Australia. His calculations, however, are contrary to the applicable regulations. If a qualified individual meets the 330-day test during a 12-month period, all days within that period are "qualifying days," whether or not the individual was present in the foreign country. *See* Treas. Reg. § 1.911-4(f) (example 4). Even under respondent's calculations, however, the applicable threshold for each year would exceed the value of petitioner's government-provided housing.

[12] Petitioner does not claim any housing expenses other than the value of the housing she was provided.

**[\*23]** § 6662(d)(2).[13] A taxpayer's understatement is "substantial" (and thus potentially subject to penalty) if the understatement exceeds the greater of $5,000 or 10% of the tax required to be shown on the taxpayer's return. § 6662(d)(1)(A). A taxpayer's understatement may be reduced, however, to the extent it is attributable to one or more positions that, although ultimately determined to be incorrect, were nonetheless supported by substantial authority. § 6662(d)(2)(B). A taxpayer may also be excused from the substantial understatement penalty (or other accuracy-related penalties) to the extent that the taxpayer had reasonable cause for her underpayment of tax and acted in good faith. § 6664(c)(1). (The definition of "underpayment" is generally the same as the definition of "understatement" in that each compares the tax imposed to the tax shown on the taxpayer's return. *See* § 6664(a) (defining "underpayment").)

Although taxpayers generally have the burden of proof under Rule 142(a), the Commissioner bears the burden of production "with respect to the liability of any individual for any penalty, addition to tax, or additional amount." § 7491(c).

Respondent argues that, because petitioner did not address on brief her liability for accuracy-related penalties, we should treat her as having conceded her liability for those penalties. The authority respondent cites, however, does not support his argument.

We have held that a taxpayer's failure *in her petition* to assign error to the Commissioner's penalty determinations relieves the Commissioner of his burden of production under section 7491(c). *E.g.*, *Funk v. Commissioner*, 123 T.C. 213, 218 (2004).

In her Petition, petitioner did not specifically assign error to respondent's determination of penalties. She used a standard form petition that provides space for a taxpayer to "[e]xplain why you disagree with the IRS determination in this case." Petitioner responded as follows:

> I believe the U.S. Treaty with Australia was overlooked or not included in the review of my original tax filings or the audit. I was conducting official Government work while in Australia as I have in other countries was denied the

---

[13] In computing a taxpayer's understatement, the tax shown on the return is "reduced by any rebate (within the meaning of section 6211(b)(2))." § 6662(d)(2)(A)(ii).

**[\*24]** physical presence consideration. But if I am denied that again I would like to look at the excessive time it took for an audit to be conducted that added additional penalties and interest. The IRS Agent, Mrs. Parks told me that she was out sick for months at a time, but my audit was never transferred to another agent who might be able to work it with her being out of the office.

In short, the only errors petitioner assigned were respondent's alleged failure to give due regard to the 1982 Treaty and the length of time taken to audit her returns. Petitioner seems to have abandoned any claim for relief under the 1982 Treaty. And her complaint about the length of the audit does not provide her legal grounds for relief. The period of limitation on assessment provides taxpayers' only basis for relief when an audit is unduly prolonged. *See* § 6501(a) (providing as a general rule that tax must be assessed within three years of the filing of the relevant return). Petitioner does not allege that the period of limitation on assessment expired before respondent issued the notice of deficiency. Nor does she have any apparent basis for such an allegation: The date of the notice of deficiency, December 10, 2020, is less than three years after the earliest date on which petitioner could have filed any of her returns for the years in issue.

Although petitioner's Petition did not specifically assign error to the adjustments in the notice of deficiency or respondent's determination of penalties, the issues of the inclusion in petitioner's gross income of the wages she received from Northrop Grumman and the value of her government-provided housing, as well as her liability for accuracy-related penalties, were all tried by the consent of the parties. Respondent identified all three issues in his pretrial memorandum. And the parties presented evidence relevant to all three issues.

The facts in *Funk* are thus distinguishable from those of petitioner's case. While petitioner did not specifically assign error to respondent's penalty determinations, the issue of her liability for the penalties was tried by the consent of the parties. Therefore, we treat petitioner as having assigned error to those determinations. Rule 41(b)(1) provides:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the

**[\*25]** pleadings. The Court, upon motion of any party at any time, may allow such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues, but failure to amend does not affect the result of the trial of these issues.[14]

If a taxpayer assigns error to the Commissioner's determinations but makes no argument on brief addressing her liability for penalties, is the Commissioner relieved of his burden of production under section 7491(c)? In other words, does the taxpayer's failure to address penalties on brief have the same effect as an initial failure to have assigned error to the Commissioner's penalty determinations?

Rule 151(e)(5) requires a party's brief to set forth the party's "argument," including a discussion of "the points of law involved and any disputed questions of fact." When a party fails to comply with Rule 151(e)(5) by ignoring an issue on brief, the party can be treated as having conceded the issue. *See, e.g.*, *Gregory v. Commissioner*, T.C. Memo. 2018-192, at \*10–11; *Remuzzi v. Commissioner*, T.C. Memo. 1988-8, *aff'd*, 867 F.2d 609 (4th Cir. 1989).

Respondent relies on *Hockaden & Associates, Inc. v. Commissioner*, 84 T.C. 13, 16 n.3 (1985), *aff'd*, 800 F.2d 70 (6th Cir. 1986), in which a taxpayer challenged the constitutionality of the excise tax imposed by section 4975. In a footnote, the Court dismissed that argument and the taxpayer's allegation of a Fifth Amendment violation. Because the taxpayer had "not raise[d] this issue in its briefs, . . . we conclude[d] that it ha[d] abandoned the argument for lack of merit." *Hockaden*, 84 T.C. at 16 n.3.

*Remuzzi*, *Hockaden & Associates*, and *Gregory* did not address penalties for which the Commissioner bore the burden of production under section 7491(c). (Indeed, the first two cases were decided before Congress enacted section 7491(c).)

Under the circumstances, however, we need not decide whether a taxpayer's failure to address penalties on brief relieves the Commissioner of his burden of production under section 7491(c). Even if petitioner's failure to address on brief her liability for the penalties respondent determined did not relieve him of his burden of production

---

[14] Rule 41(b)(1) was amended, without substantive effect, as of March 20, 2023.

[*26] under section 7491(c), respondent has met his burden in the case before us.

To meet his burden, the Commissioner has to "come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." *Higbee v. Commissioner,* 116 T.C. 438, 446 (2001). When the relevant penalty is the substantial understatement penalty provided in section 6662(a) and (b)(2), the Commissioner first has to show that the taxpayer had substantial understatements for the years in question.

Petitioner's 2017 return should have showed a tax of slightly more than $25,374 (the $26,407 total corrected tax liability shown on the Form 4549–A included with the notice of deficiency less the $1,033 self-employment tax respondent determined).[15]  Because petitioner received a refund of $25,170 on the ground that the tax imposed for 2017 was less than the $25,519 of tax shown on her return for the year as originally filed, her refund was a "rebate," within the meaning of sections 6211(b)(2) and 6662(d)(2)(A).  *See* Treas. Reg. §§ 1.6662-4(b)(5), 1.6664-2(e).  The refund reduced to $349 ($25,519 − $25,170) the amount described in section 6662(d)(2)(A)(ii) (that is, the amount compared to the tax required to be shown on the taxpayer's return in computing the taxpayer's understatement).  Petitioner thus has an understatement for 2017 of slightly more than $25,025 ($25,374 − $349).  Because that amount is larger than $5,000 (which, in turn, is more than 10% of the tax required to have been shown on petitioner's return), her 2017 understatement is a substantial understatement.

Petitioner's 2018 return should have shown tax of slightly more than $21,577 (the $22,943 total corrected tax liability shown on Form 4549–A less the $1,366 self-employment tax respondent determined). Because petitioner's return for that year showed tax of only $195, she had an understatement for the year of slightly more than $21,382 ($21,577 − $195). Petitioner's 2018 understatement thus exceeds $5,000 (which, in turn, is more than 10% of the tax required to have been shown on her return).  Consequently, petitioner's understatement for 2018 was

---

[15] The $25,374 figure given in the text slightly understates petitioner's tax for 2017 because it takes into account the $517 deduction respondent allowed under section 164(f) for one-half of the self-employment tax he determined.  Respondent concedes that petitioner was not subject to that tax.  Consequently, she is not entitled to any deduction under section 164(f).

**[\*27]** also a "substantial understatement," within the meaning of section 6662(d)(1)(A).

The Commissioner's burden of production under section 7491(c) requires him to establish compliance with the supervisory approval requirements of section 6751(b)(1). *Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016); *Carter v. Commissioner*, T.C. Memo. 2020-21, at \*27, *rev'd and remanded per curiam*, No. 20-12200, 2022 WL 4232170 (11th Cir. Sept. 14, 2022). Section 6751(b)(1) provides: "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate."

Although section 6751(b)(1) does not explicitly require that "the written approval of the 'initial determination of . . . assessment' occur at any particular time before the 'assessment' is made," *Graev*, 147 T.C. at 477, we have interpreted the provision to require approval before the first communication to the taxpayer that demonstrates that an initial determination has been made, *Carter*, T.C. Memo. 2020-21, at \*27.

Section 7491(c) assigns to the Commissioner only the burden of production in regard to penalties. It does not impose on him the entire burden of proof. In general, the burden of proof is on the taxpayer. Rule 142(a). Although section 7491(a) shifts the burden of proof to the Commissioner in specified circumstances, petitioner makes no argument that those conditions were met in the present case.

In *Frost v. Commissioner*, 154 T.C. 23, 35 (2020), we held that "the Commissioner's introduction of evidence of written approval of a penalty before a formal communication of the penalty to the taxpayer is sufficient to carry his initial burden of production under section 7491(c) to show that he complied with the procedural requirements of section 6751(b)(1)." If the Commissioner makes that showing, the burden would then shift to the taxpayer "to offer evidence suggesting that the approval of the . . . penalty was untimely—e.g., that there was a formal communication of the penalty before the proffered approval." *Id.* If the taxpayer introduces evidence to that effect, we would then "weigh the evidence before us to decide whether the Commissioner satisfied the requirements of section 6751(b)(1)." *Id.*

**[\*28]** If the Commissioner bore the entire burden of proof, and not just the burden of production, it would be the Commissioner's responsibility to establish that no sufficiently formal communication of the penalty occurred before the supervisor granted approval. In *Chai v. Commissioner*, 851 F.3d 190 (2d Cir. 2017), *aff'g in part, rev'g in part* T.C. Memo. 2015-42, the Court of Appeals for the Second Circuit did not clearly differentiate between the burden of production and the larger burden of proof. As we observed in *Graev*, 149 T.C. at 493 n.14, some of the Second Circuit's statements in *Chai* could be read to have "suggested that the Commissioner . . . bears the burden of proof, in addition to the burden of production, with respect to sec. 6751(b) issues." The court purported to "hold that compliance with § 6751(b)(1) is part of the Commissioner's burden of production and proof." *Chai v. Commissioner*, 851 F.3d at 221. While it noted that section 7491(c) assigns the Commissioner the burden or production, however, the court cited no authority that would impose on the Commissioner the entire burden of proof. In *Graev*, 149 T.C. at 493 n.14, we expressed "doubt" as to "whether *Chai* meant to impose upon the Commissioner the burden of proof or just—as provided in sec. 7491(c)—the burden of production." And in *Frost*, we implicitly concluded that the Commissioner bears only the burden of production. In that case, the Commissioner submitted a signed Civil Penalty Approval Form for one of the years in issue with an electronic signature dated more than a year before the date of the notice of deficiency. We acknowledged that the Commissioner had not shown "that there were no formal communication(s) to [the taxpayer] about the penalty before the penalty was approved." *Frost*, 154 T.C. at 35. Nonetheless, we concluded that the Civil Penalty Approval Form met the Commissioner's burden of production for the year to which it related. Thus, we implicitly determined that the taxpayer, not the Commissioner, bore the responsibility for establishing a formal communication of the penalty earlier than the notice of deficiency (and earlier than the date of the supervisor's electronic signature on the Civil Penalty Approval Form). In other words, our conclusion that approval was timely necessarily rested on the premise that the Commissioner bears only the burden of production assigned to him by section 7491(c), while the overall burden of proof remains with the taxpayer under Rule 142(a) (unless the conditions of section 7491(a) are satisfied).

On the basis of the parties' stipulations concerning penalty approval in the present case, respondent argues that Agent Parks "properly obtained written supervisory approval of the proposed substantial understatement penalties for [petitioner's] 2017 and 2018 taxable years." We agree. The stipulations establish that Ms. DeLellis

**[\*29]** approved the penalties before Agent Parks sent petitioner the 30-day letter, which, under our caselaw, demonstrates that an initial determination of penalties has been made. *See Clay v. Commissioner*, 152 T.C. 223, 249 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021). Although the stipulations do not rule out the possibility of an earlier communication of an initial determination of penalties,[16] petitioner presented no evidence that any such communication occurred. Indeed, petitioner makes no argument at all in regard to the penalties respondent determined. Therefore, the stipulations are sufficient to meet respondent's burden of production under section 7491(c) and petitioner has not met her burden of proving that Ms. DeLellis's approval was untimely.[17]

When the Commissioner meets his burden of production under section 7491(c) of "com[ing] forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty," it becomes incumbent on the taxpayer to raise defenses such as reasonable cause or substantial authority. *Higbee*, 116 T.C. at 446. Petitioner, however, raised no such defenses. Again, she did not address penalties at all in her brief. We therefore conclude that petitioner is liable for a substantial understatement penalty for each of the years in issue in an amount to be determined by the parties, taking into account

---

[16] In addition, the stipulations do not conform precisely with the text of section 6751(b)(1). That Agent Parks made the initial determination to *assert* the penalties does not establish that she also made the determination to *assess* them. Strictly speaking, therefore, the stipulations fall short of establishing that Ms. DeLellis was the appropriate person to grant supervisory approval. Under the circumstances, however, we are willing to infer that Agent Parks's determination encompassed both the assertion and assessment of the penalties in issue. We view it as unlikely that, while Agent Parks determined to assert the penalties, another official whose involvement in the case is not disclosed by the record made a separate determination to assess the penalties.

[17] Because Ms. DeLellis's approval was timely under this Court's more stringent test, it is of no moment that the U.S. Court of Appeals for the Ninth Circuit (the likely appellate venue given petitioner's residence in Arizona when she filed her Petition, *see* § 7482(b)(1)) would employ a more lenient test. *See Laidlaw's Harley Davidson Sales, Inc. v. Commissioner*, 29 F.4th 1066 (9th Cir. 2022), *rev'g and remanding* 154 T.C. 68 (2020); *Kraske v. Commissioner*, No. 27574-15, 161 T.C. (Oct. 26, 2023); *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

[*30] respondent's concession of the self-employment tax he determined in the notice of deficiency.

*Decision will be entered under Rule 155.*